# United States Court of Appeals

### For the Eighth Circuit

_____

No. 13-1162

_____

United States of America

*Plaintiff - Appellee*

v.

Jason Bo-Alan Beckman, also known as Bo Beckman

*Defendant - Appellant*

_____

No. 13-1163

_____

United States of America

*Plaintiff - Appellee*

v.

Gerald Joseph Durand, also known as Jerry Durand

*Defendant - Appellant*

_____

No. 13-2603

_____

United States of America

*Plaintiff - Appellee*

v.

Patrick Joseph Kiley, also known as Pat Kiley

*Defendant - Appellant*

_____

Appeals from United States District Court
for the District of Minnesota - St. Paul

_____

Submitted: October 8, 2014
Filed: May 12, 2015

_____

Before RILEY, Chief Judge, WOLLMAN and BYE, Circuit Judges.

_____

RILEY, Chief Judge.

Five players in a partial Ponzi scheme received over $193 million from unsuspecting investors. Trevor Cook and Christopher Pettengill pled guilty, and defendants Jason Bo-Alan Beckman, Gerald Durand, and Patrick Kiley proceeded to trial. After a twenty-nine day trial, a jury found the defendants guilty on all counts, including fraud, conspiracy, and money-laundering, and the district court[1] sentenced each to decades in prison. The defendants appeal their convictions and sentences. We affirm.[2]

_____

[1]The Honorable Michael J. Davis, Chief Judge, United States District Court for the District of Minnesota, adopting the report and recommendation of the Honorable Jeffrey J. Keyes, United States Magistrate Judge for the District of Minnesota.

[2]We possess appellate jurisdiction under 28 U.S.C. § 1291.

## I.    BACKGROUND

### A.    Facts

"We present the facts in a light most favorable to the verdicts, drawing all reasonable inferences from the evidence that support the jury's verdicts." United States v. Ramon-Rodriguez, 492 F.3d 930, 934 (8th Cir. 2007).  From July 2006 through September 2009, the defendants' partial Ponzi scheme[3] received over $193 million from hundreds of investors.  Only $49 million was returned to some investors, all of which came from new investors' money.  Some investors lost their life savings. The five schemers profited in varying amounts:  $12.2 million for Cook; $4.8 million for Beckman; $4.3 million for Pettengill; $1.9 million for Durand; and $432,000 for Kiley.

The schemers induced victims to invest in various entities they created, many named either with the initials "UBS" (UBS entities) or the word "Oxford" (Oxford entities).  According to SEC accountant Scott Hlavacek, the schemers described a "currency program" to potential investors leading investors to believe "they would be investing in foreign currency trading, which was guaranteed and . . . had a . . . fixed rate every month."  Some of the money "was actually invested in foreign currencies," but none of the money was "invested in a completely safe, secure, and guaranteed currency product," as the defendants promised.

For example, Beckman's firm, "Oxford Global Advisors," which was "one of the . . . primary recipients of investor funds" in the scheme, stated in a solicitation

---

[3]U.S. Securities and Exchange Commission (SEC) accountant Scott Hlavacek testified, "In a true Ponzi scheme[,] the money . . . is just used for the benefit of the people raising the money and then to make payments to older investors with new investors' money."  In contrast, "[i]n a partial Ponzi scheme[,] some of the money might be . . . use[d] for something close to what [the schemers are] saying, but the rest of the money is used to pay old investors with new investors' money and to benefit the individuals raising the money."

brochure that its "Federal Funds Income Advantage" program had a current annual yield of 12% and promised "instant[] liquid[ity]" and "zero fluctuation of principal." Each investor's account would be "segregated"—"not co-mingled [sic] with the general assets of the custodian, bank or dealer," and funds would be invested in various foreign currencies and then traded for gain depending on favorable interest rates. Beckman told his victims they could not lose money in the currency program—the investment was "risk-free" and "completely safe"—and that it was a "fixed income product" "that delivers this safe 10 to 12 percent return on your money." Beckman also falsely inflated his own credentials. For example, Beckman claimed to be "in the top-ranked tier of portfolio managers per a Morningstar comparative study," a study and ranking that did not exist. One victim testified this false credential "factored into [her] decision to make this investment."

Beckman claims it was only in April 2008 that he learned the investors' money in the currency program was not held in segregated accounts but was pooled together. Yet, Beckman still obtained another $24 million of investors' money for the currency program. For the period August 2006 to July 2009, Beckman's personal clients invested more than $47 million.

At trial, a securities executive, Donald Bizub, who had a professional relationship with Beckman, testified that in August 2008 he had seen "an ad on an Oxford related page talking about a fixed income investment paying I believe it was 10 and a half percent guaranteed." Bizub was concerned because "typically when you see ads like this, there's always an asterisk with a whole bunch of disclaimer at the bottom; and [he did not] see an asterisk or any disclaimer." Bizub clicked a link on the website and sent an email with the subject line, "How's 10.5% fixed return sound," and requested, "Please tell me more about this investment." Beckman's colleague, Gene Walden, forwarded Bizub's email to Beckman, stating, "Just got this—he must have seen this in our e-newsletter on the web site."

-4-

Beckman forwarded the email to Cook, writing, "Now the ship begins to sink. This is not good. I will needless to say take care of it, I just wanted you to know." Cook wrote back to Beckman, "I am very sorry about this. . . . I think the good news is that . . . we can blame it on a trainee sales rep who was fired . . . say nothing he did was approved . . . also say we have opinion letters from attorneys about the product . . . . So please see me if you would like any ammunition to respond . . . . Individually managed accounts is very im[p]ortant . . . remember this bullet point." Even after the ship began to sink, Beckman still solicited over $12 million in additional investor funds into non-segregated accounts.

Some of the victims learned of the currency program through Gerald Durand's radio shows, "Expand Your Wealth" and "Wealth Survival"—on which Beckman was a guest. Durand also solicited investors by advertising "educational workshop[s]," stating he and "UBS Diversified, which manages over 2 billion dollars in assets," could advise how to "double your money in less than 5 years" and "earn 15% per year with no risk." Durand testified at a hearing in a related civil case that Cook chose the name "UBS Diversified" "to confuse people." For example, Beckman emailed to one of his investors that the "fixed income alternative" would yield "12% for 12 months and [was] backed by UBS (not someone we met on the street)," and the investor was led to believe "UBS" meant the Union Bank of Switzerland. Beckman's brochure included the genuine UBS logo on the last page, along with several other investment banks. Durand testified the schemers stopped using the fund name "UBS" after the Swiss bank sued them.

One investor victim testified that after listening to Durand's radio show, he attended six or seven seminars where "the emcee would kick things off . . . and say that these are some of the most brilliant people that he knows in the financial industry . . . and then . . . he would have . . . Jerry Durand come up and give a little spiel for 15 minutes, then [Jason] Beckman, then Trevor Cook, and they would all give their deal . . . . I thought these people were the best and the brightest. And I'm usually a

very conservative type person and they really sold me." The investor and his family lost over $370,500.

Durand, who was also "Managing Director" of Oxford Global Advisors, placed his name on a UBS Diversified version of the "Federal Funds Income Advantage" brochure, which promised "[i]nterest rates . . . [c]redited at 12% annually" and stated, "The entire contents of this brochure is solely the responsibility of UBS Diversified. . . . For more information, please contact Gerald J. Durand." Durand wrote an investor that UBS Diversified's customer funds were "insured by measures enacted by the Federal Government" and "held in segregated accounts," and that Durand's "people" at the firm were licensed brokers. Based on Durand's representations that the investor's funds would be held in a segregated account and the principal could not be lost, the investor mortgaged his home, entrusted the proceeds and more to Durand, and lost several million dollars.

Kiley also had a radio show, "Follow the Money." Kiley's radio show was broadcast on a Christian radio station, and Kiley described himself as a Christian man—"he always closed his broadcast with a prayer." One of Kiley's early investors, Duke Thietje, stated this "ha[d] an impact on [his] investment decision" because [Thietje] was "a person of the Bible [him]self [and] wanted someone who was of personal integrity." On the radio, Kiley gave a phone number that listeners could call for more information—Kiley would then talk with the caller and send brochures from "UBS," claiming it was a "registered financial advisory firm." While telling potential investors their funds would be kept in segregated accounts, Kiley personally deposited many investors' funds into the same account and also wrote checks to satisfy occasional withdrawal requests.

Kiley's radio show also suggested listeners consult his website, www.patkiley.com, where he lied about his own credentials, stating he was "an independent financial analyst for a multi billion dollar corporation" and "[h]is clients

range from top international funds and banks to the everyday investor." Kiley's website advertised "The Wealth Management Group" that "currently oversees several billions in assets" and "provides individual investors access to arbitrage," known as "a **risk-less** transaction" with "***individually segregated***" customer accounts that are "***totally liquid***." Kiley told Thietje "the funds would be traded in foreign currencies and it was a rather successful program, having stops and so on, so there would be little chance to really lose a large amount." Thietje testified Kiley's representation of "complete safety" for his funds "was the most determining factor" in his decision to invest with Kiley. Thietje stated Kiley's representations led him to conclude his funds "would be safer in the program than with [his] bank." Thietje lost approximately $340,000. Undeterred after Thietje's loss, Kiley and his representatives repeated the same promises on his radio show, his website, and in brochures and letters to currency program investors who lost their investments just as Thietje did. Kiley "was a money machine" who "brought in the vast majority"—about two thirds—of the money invested in the currency program.

## B.     Procedural History

A jury found the defendants guilty on all counts charged against them in a second superseding indictment (indictment). As relevant to this appeal, all three defendants were convicted of committing or aiding and abetting the commission of wire fraud or mail fraud in violation of 18 U.S.C. §§ 2, 1341, and 1343; conspiracy to commit mail fraud and wire fraud in violation of 18 U.S.C. § 1349; and money laundering in violation of 18 U.S.C. §§ 2 and 1957. Beckman, individually, was also convicted of committing or aiding and abetting the commission of wire fraud regarding his interactions with elderly victims Charlotte and Raymond Olson in violation of 18 U.S.C. §§ 2 and 1343; committing or aiding and abetting the commission of mail fraud, regarding his attempt to purchase an interest in the Minnesota Wild hockey team of the National Hockey League (NHL) in violation of 18 U.S.C. §§ 2 and 1341; and filing false tax returns in 2007 and 2009 and tax evasion in 2008 in violation of 26 U.S.C. §§ 7201 and 7206(1). The district court

sentenced Beckman to 360 months imprisonment and Durand and Kiley to 240 months imprisonment.

## II.      DISCUSSION

### A.      Evidentiary Rulings

"We review evidentiary rulings of a district court for abuse of discretion, giving substantial deference to the district court's determinations. This court may reverse only if an error 'affects the substantial rights of the defendant' or has 'more than a slight influence on the [jury's] verdict.'" United States v. Manning, 738 F.3d 937, 942 (8th Cir. 2014) (alteration in original) (internal citations omitted) (quoting United States v. Yarrington, 634 F.3d 440, 447 (8th Cir. 2011)).

### 1.      Federal Rule of Evidence 404(b)

"Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). But "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Id. 404(b)(2). To be admissible at trial, prior acts must:

> (1) be relevant to a material issue raised at trial, (2) be similar in kind and close in time to the crime charged, (3) be supported by sufficient evidence to support a finding by a jury that the defendant committed the other act, and (4) not have a prejudicial value that substantially outweighs its probative value.

United States v. Turner, 583 F.3d 1062, 1066 (8th Cir. 2009). We review the district court's Rule 404(b) decisions for abuse of discretion. See id. at 1065.

### a. Beckman

Beckman claims the district court improperly admitted several pieces of damaging character evidence. First, Beckman admits he was "involuntarily disenrolled" from the Air Force Academy "for lying." Second, the government stated it intended to introduce evidence that Beckman purportedly forged his mother's signature on two student loan applications. The district court granted Beckman's motion in limine to exclude both lines of inquiry but stated in the order—and again before Beckman took the stand—that the government could introduce the evidence "for impeachment purposes." On Beckman's cross-examination, the district court properly admitted both pieces of evidence under Federal Rule of Evidence 608(b). See Rule 608(b)(1) ("[T]he court may, on cross-examination, allow [specific instances of conduct] to be inquired into if they are probative of the character for truthfulness or untruthfulness of . . . the witness."); cf. Rule 404(b)(2).

Finally, at trial, Beckman's mother stated that around 2002, she sued him as personal representative of his grandfather's estate after he (1) mortgaged his grandfather's house to pay his own debts; (2) pocketed the profit from the later sale of the house; and (3) failed to distribute other assets—testimony Beckman also had attempted to exclude with a motion in limine. Beckman complains the district court erred by admitting this Rule 404(b) evidence because the events were remote in time and the evidence could have had "an incendiary effect." Although the evidence was relatively remote, the government examined Beckman's mother on these points to refute Beckman's statement to the NHL that he invested the principal of his grandfather's estate for the benefit of his mother. The evidence was directly relevant to the charges against Beckman of defrauding the NHL, and "'[t]his court gives great deference to the district court's weighing of the probative value of evidence against its prejudicial effect.'" United States v. Gant, 721 F.3d 505, 510 (8th Cir. 2013) (quoting United States v. Tyerman, 701 F.3d 552, 563 (8th Cir. 2012)); see Fed. R. Evid. 403. The district court did not abuse its discretion in admitting Beckman's mother's testimony.

### b. Durand

In a pretrial order, the magistrate judge required the government to disclose any Rule 404(b) evidence "no less than **thirty days** before trial." The "government's trial memorandum, 404(b) notice, motions in limine and memorandum in support thereof," filed March 6, 2012, stated, "The trial evidence will show that Trevor Cook and Gerald J. Durand and their associates – the people running the currency program that Mr. Beckman repeatedly promoted as a principal-protected, legitimate, prudent investment – routinely drank alcohol and/or used drugs at the mansion to the point of morbid intoxication." This sentence was included in a section of the document that addressed Beckman, not Durand, and did not specifically refer to Rule 404(b). As such, Durand claims he was not given notice as required by the magistrate judge, even though trial began on April 19, 2012, more than thirty days after the government filed its notice. While the government did not include the challenged drug information under a 404(b) heading specifically addressed to Durand, the document still gave Durand notice of the evidence the government intended to introduce, effectively satisfying the magistrate judge's order.[4]

At trial, the government introduced witness Stephanie Bolton, Durand's former assistant. Bolton testified, over Durand's objection, she would smoke marijuana[5] at the currency program place of business three to four days a week, on a daily basis Durand would interact with clients "when he was stoned," and Durand knew Cook conducted business while drunk. Durand now argues the district court erred by allowing the testimony. See Fed. R. Evid. 401, 403, 404(b).

---

[4]Before the noticed witness testified in front of the jury, the district court heard argument on Durand's motion.

[5]Durand also argues he had no notice because the government's memo referred to "drugs," and not specifically "marijuana." Durand's argument is specious—he, too, uses the terms interchangeably in his brief—and we reject this disingenuous argument.

-10-

After Bolton's testimony, a juror advised the district court the juror, too, smoked marijuana, and he may have been "more sympathetic to" Durand. The district court removed the juror on the government's motion. Later, Durand moved to voir dire the remaining jury members as to marijuana use, which the district court denied. Durand appeals this decision as well.

The district court did not abuse its discretion by declining to ask already impanelled jurors questions about their views concerning illegal drug use on the seventh day of a lengthy, complicated trial. Durand was on notice from the government's trial brief that it intended to introduce such evidence, so Durand could have filed a motion to ask such questions himself on voir dire before the jury's impanelment. While it may strain credulity to imagine this drug and alcohol evidence was necessary to the government's case, we reverse "'only when the evidence clearly had no bearing on the case and was introduced solely to show defendant's propensity to engage in criminal misconduct.'" Gant, 721 F.3d at 509 (quoting United States v. Farish, 535 F.3d 815, 819 (8th Cir. 2008)). The district court did not abuse its considerable discretion in evidentiary matters by allowing the marijuana testimony.

### 2.     Hypothetical Questions

Beckman objects to what he calls the government's use of "guilt assuming hypotheticals" during trial. See United States v. Barta, 888 F.2d 1220, 1224-25 (8th Cir. 1989) (holding the district court erred by allowing "questions premised on an assumption of guilt"). Beckman objected to two such questions early in the trial, but admits he opted not to object to the questions he challenges on appeal because "further objections would only highlight [the issue] for the jury." We now review for plain error. See United States v. Big Eagle, 702 F.3d 1125, 1130 (8th Cir. 2013). "Under plain error review," Beckman "must show 'that the district court committed an error that is clear or obvious, that the error affected his substantial rights, and that the error seriously affects the fairness, integrity, or public reputation of judicial

proceedings.'" Id. (quoting United States v. Troyer, 677 F.3d 356, 358-59 (8th Cir. 2012)).

The district court did not err, plainly or otherwise, by allowing what Beckman describes as the hypothetical questions. First, Beckman does not adequately develop an argument about most of the challenged hypothetical questions, merely reciting them in footnotes and conclusively stating the questions assume guilt, so we do not address the undeveloped challenges here. See Fed. R. App. P. 28(a)(8)(A); Rotskoff v. Cooley, 438 F.3d 852, 854 (8th Cir. 2006) (declaring an argument waived when not developed in appellate brief).

Beckman does argue the district court clearly erred by allowing the following line of questioning of Jitesh Mehta, who worked as an unlicensed broker for Beckman:

> Q. I want to call your attention to the date here. The date of this e-mail is October 21, 2008; is that correct?
>
> A. That's correct.
>
> Q. Prior to this time had Mr. Beckman indicated to you at all that in August of 2008 he was told that this was a Ponzi scheme or very likely a Ponzi scheme?
>
> A. No, I was not told.

Before Mehta's testimony, Martin Klotz, an attorney with the Willkie Farr law firm (Willkie Farr), testified he had represented Oxford Global Advisors and had been retained "to analyze the [currency] program and give advice on the legality of it." Klotz testified he told Beckman, "[i]n substance," that he thought Cook was "a crook" who was "likely running a Ponzi scheme." So the question to Mehta was not a

hypothetical, but repeated an assertion already in evidence.  The district court did not plainly err in admitting Mehta's testimony.

### 3.    Internal Revenue Service (IRS) Agent Matthew Schommer

On appeal, though not at trial, Beckman objects to questions the government asked IRS Agent Matthew Schommer.  Again, we review for plain error.  Beckman specifically objects to the use of the term "investigative significance":

> Q.    Based on your investigation in the case, Agent Schommer -- well, what if any, investigative significance did this have? Let's put it that way.

> A.    The victim investors that are purported here to get wire transfers never received the money.

Agent Schommer made a statement of fact, that the victims did not receive the money, and Beckman claims Agent Schommer was drawing inappropriate conclusions about the evidence.  Again in a footnote, Beckman cites over a dozen other instances of use of the term "investigative significance," to which he did not object at trial.  Beckman's contention is without merit.  Beckman has not shown any error (if one existed) affected Beckman's substantial rights or "'seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings.'"  Big Eagle, 702 F.3d at 1130 (quoting Troyer, 677 F.3d at 358-59).

Both Beckman and Durand also challenge Agent Schommer's testimony as a lay witness.[6]  They claim on appeal, as Durand objected at trial, the government's

---

[6]On one occasion during Agent Schommer's testimony spanning five days, the district court errantly stated Agent Schommer was an expert.  Soon thereafter, the government agreed with Durand that Agent Schommer was not testifying as an expert, but as a summary witness, which Beckman clarified at the beginning of his cross-examination of Agent Schommer.

questions elicited lay opinion testimony in violation of Federal Rule of Evidence 701. Agent Schommer's testimony was based upon his work as case agent *in this case*, and "the 'testimony of a summary witness may be received so long as []he bases h[is] summary on evidence received in the case and is available for cross-examination,'" United States v. Robinson, 439 F.3d 777, 781 (8th Cir. 2006) (quoting United States v. King, 616 F.2d 1034, 1041 (8th Cir. 1980)). The district court did not abuse its discretion by admitting Agent Schommer's testimony.

### 4. Attorney-Client Privilege

In February 2008, Beckman personally hired Kari Berman of the Briggs and Morgan law firm (Briggs) with regard to his application to purchase an interest in the Minnesota Wild NHL team. In February or March 2008, "the Oxford Group" also hired Briggs for representation in "general corporate and transactional matters." After a due diligence investigation, in May 2008, Briggs advised the Oxford Group that Pettengill informed Briggs that notes sold by Oxford Global Advisors' agents (OGA Notes) "have not been registered under federal or state law and have not been qualified for any exemption from registration." Briggs advised the Oxford Group to "immediately stop all sales and the solicitation of any sales of OGA Notes." Briggs stated, "Because of potential conflicts of interest between various individuals and entities and the potential for criminal law consequences, we recommend that you promptly retain other legal counsel to advise you regarding the past sales of OGA Notes and any future actions you should take with respect to such sales." Briggs also advised, "During the course of Briggs and Morgan's legal representation of you, it has also come to our attention that other Oxford business activities appear to be in violation of numerous federal statutes and regulations. . . . [W]e recommend that you promptly retain other legal counsel to advise you regarding such matters."

Thereafter, at least as of May 20, 2008, two of the Oxford entities hired Robert Mendelson of the Morgan, Lewis & Bockius law firm (Morgan Lewis) for securities law advice. In response to the question, "[W]ho was the primary face of the client?"

-14-

Mendelson testified, "I primarily interacted with Mr. Beckman." Morgan Lewis withdrew its services from the Oxford entities on June 27, 2008, sending a "noisy withdrawal letter,"[7] because the attorneys "reached the conclusion [their] advice was not going to be followed." The subject line of the withdrawal letter read "Retention of Morgan, Lewis & Bockius LLP by Oxford Global Advisors, LLC and Oxford PCG" and reported, "We concluded that, at a minimum, the investment was not marketed in compliance with regulatory requirements." The letter listed the remedial measures Morgan Lewis had recommended and stated, "Despite your agreement that these actions should be taken, they simply have not. . . . Given the circumstances, we believe we have no option other than to withdraw. . . . We highly recommend that these entities obtain legal counsel to evaluate the issues we have outlined herein."

On July 17, 2008, Oxford Global Advisors, LLC next engaged Martin Klotz at Willkie Farr.[8] The subject line of Willkie Farr's engagement letter read, "Representation of Oxford Global Advisors, LLC," and the letter declared, "We are delighted to have the opportunity to represent Oxford Global Advisors, LLC (the 'Client')." Klotz testified Beckman "was the face of [his] client."

Finally, Beckman signed another personal representation letter with Briggs dated July 21, 2008.

---

[7]Mendelson testified a "noisy withdrawal letter" "is a letter you send to a client when you are withdrawing as their counsel and you want the reasons to be readily apparent."

[8]Within a few weeks, Klotz "made a comment [to Beckman] to the effect of . . . [t]he notion that you can borrow unlimited amounts of money interest-free and create a risk-free investment is ridiculous. Among other things, some clever person would have figured it out a long time ago if it was that easy. This just makes no sense."

-15-

Before trial, the district court denied motions to quash subpoenas by law firms Briggs, Morgan Lewis, and Willkie Farr, along with Beckman's motions to exclude attorney-client communications. The district court noted the Oxford entities were in receivership, see, e.g., SEC v. Cook, No. 0:09-cv-3333 (D. Minn. Dec. 11, 2009) (second amended order appointing receiver), and the receiver had waived the attorney-client privilege. The district court found Morgan Lewis and Willkie Farr were hired to represent Oxford entities, not Beckman, and no attorney-client privilege attached between Beckman and either Morgan Lewis or Willkie Farr. Attorneys Berman, Mendelson, and Klotz testified at trial, and the government introduced the letters quoted above, as well as other attorney-client communications. "We review [the district court's privilege] finding for clear error." United States v. Spencer, 700 F.3d 317, 320 (8th Cir. 2012).

Beckman now proposes the district court erred by admitting attorney-client privileged evidence because Beckman sought legal advice from Morgan Lewis and Willkie Farr for himself personally, as well as on behalf of Oxford entities, and the personal relationship cannot be separated from the corporate relationship. "The attorney-client privilege protects confidential communications between a client and his attorney made for the purpose of facilitating the rendering of legal services to the client." Id. While Beckman may have been the "face of" the client, he was not the client itself. The May 2008 Briggs letter clearly advised that the separation of representation of Beckman personally and the Oxford entities was of paramount importance, and the purpose of retaining Morgan Lewis, and then Willkie Farr, ostensibly was to accomplish that separation. The district court properly found, based on the correspondence introduced, that Morgan Lewis and Willkie Farr represented Oxford entities, not Beckman.

Similarly, the district court properly denied Beckman's motion in limine to exclude a July 31, 2008, email from Klotz to Beckman—quoted in the indictment—that reads, "Under the most optimistic analysis of what happened here,

-16-

. . . the . . . investment program is riddled with illegalities: illegal sale of unregistered securities, inadequate or misleading disclosures to clients, both about the investment product and about the fees, and transactions by unlicensed persons and entities, to take the most obvious examples." Beckman argued to the district court that the introduction of the email violated his attorney-client privilege with Klotz, but the district court found (1) Beckman waived the privilege by disclosing the communication to a third party, and (2) the receiver waived the Oxford Group's privilege with Klotz, and Klotz did not represent Beckman personally, so the privilege did not apply.

As to Briggs, who did represent Beckman personally, the district court determined the crime-fraud exception to the attorney-client privilege applied and admitted Berman's testimony. See United States v. Zolin, 491 U.S. 554, 562-63 (1989) (explaining the attorney-client privilege does not extend to communications regarding future wrongdoing). We review the district court's determination "for abuse of discretion, according its determination considerable deference." In re Grand Jury Proceedings, G.S., F.S., 609 F.3d 909, 913 (8th Cir. 2010).

Beckman suggests there is no evidence he intended to engage in future wrongdoing when he hired Briggs in February 2008. The government introduced ample evidence to the contrary. First, the government introduced an affidavit from Joel Barth, a financial analyst. The NHL hired Barth's firm "to perform financial due diligence on persons who apply to acquire ownership interests in NHL teams." After Beckman applied to become a part owner of the Minnesota Wild, Barth "performed the financial due diligence on Mr. Beckman to ascertain if Mr. Beckman had the financial resources he reported." Barth received most of Beckman's financial information directly from Briggs. For example, Beckman provided a "Statement of Financial Condition" that stated his net worth, together with his wife, was over $21 million, including over $20 million from an investment in Oxford Group, LLC. Barth doubted the legitimacy of most of the Oxford Group assets. Barth found an "error . . .

-17-

of such magnitude – amounting to millions of dollars – that it appeared to [him] that [he] had been misled." Beckman had also "reported through counsel that the Oxford Group had at least $4.2 billion under management," but this "was strongly contradicted by other readily available data."

Second, IRS Special Agent John Tschida also reviewed the materials Beckman had made available to Barth. Special Agent Tschida concluded in his affidavit, "With the assistance of Briggs and Morgan, Mr. Beckman prepared and then submitted a large volume of false and misleading information to the NHL in order to fraudulently induce it to accept his ownership application and even used the same Briggs and Morgan attorneys as references on his application."

Relying on the two affidavits and additional evidence reviewed *in camera*, the district court determined the evidence showed an ongoing effort to defraud the NHL and applied the crime-fraud exception. The district court did not abuse its discretion by finding the crime-fraud exception applied and receiving into evidence the attorney communications.

### 5.    Durand-Pettengill Video Recording

During the government's investigation of Beckman, Durand, and Kiley, Pettengill agreed to assist the government by surreptitiously using a video-recording device during a meeting with Durand. The government moved in limine to exclude the admission of the recording at trial. In response, Durand asked to introduce the recording to impeach Pettengill. On May 10, 2012, without the jury present, the district court heard argument and granted the government's motion, stating "[the recording] will be excluded from being used as impeachment."

The next day, May 11, 2012, the district court entered a written order granting the government's motion in limine as to statements by Durand only, stating they were exculpatory and therefore inadmissible hearsay because they would be advanced by

Durand as proof of "the truth of the matter asserted." Fed. R. Evid. 801(c)(2); see also Fed. R. Evid. 802; United States v. Edwards, 159 F.3d 1117, 1127 (8th Cir. 1998) ("[E]xculpatory out-of-court declarations are not admissible hearsay."). In the written order, the district court did allow Durand to introduce Pettengill's statements for impeachment purposes. That day at trial, Durand confirmed he had received the written order, but Durand did not use the recording to impeach Pettengill.

Days later, during Durand's cross-examination of Agent Schommer, Agent Schommer acknowledged he considered the Durand-Pettengill recording in preparing for trial. At that point, Durand again attempted to enter the entire recording into evidence, including Durand's statements. After argument at sidebar, the district court confirmed its written order.

On appeal, Durand argues he should have been able to play the recording during his cross-examination of Agent Schommer, when the recording would not be offered for the truth of the matter asserted, but rather "to reveal the effect on SA Schommer who considered it in forming lay opinions." Durand does not offer any specifics as to how the recording would have assisted the trier of fact in evaluating Agent Schommer's testimony, merely concluding the jury would have seen that Agent Schommer's "conclusions could not have been based upon a real investigation."

"'A statement offered to show its effect on the listener is not hearsay.'" United States v. Wright, 739 F.3d 1160, 1170 (8th Cir. 2014) (quoting United States v. Dupree, 706 F.3d 131, 136 (2d Cir. 2013)). But here, Durand does not establish the relevance of the Durand-Pettengill recording in relation to any effect on Agent Schommer. Unlike other cases where we have admitted similar evidence, see, e.g., id. at 1171; United States v. Cline, 570 F.2d 731, 734-35 (8th Cir. 1978), Durand does not offer any hint as to how the recording would be relevant to Agent Schommer's investigation. The district court did not abuse its discretion by excluding Durand's statements on the recording as inadmissible, exculpatory hearsay.

-19-

### 6. Kiley's Objections

For the first time on appeal, Kiley argues the district court erred by admitting improper opinion testimony from three witnesses. We review for plain error. See Big Eagle, 702 F.3d at 1130.

First, Kiley objects to Pettengill's testimony (1) agreeing Pettengill himself was "right in the middle of this fraudulent mess," (2) stating there was "no doubt in [Pettengill's] mind [the information Kiley 'put on his website about himself'] was false," and (3) agreeing "that at some point in time Mr. Kiley knew that this currency program was not what [the schemers] were telling people it was." Kiley also objects to attorney Klotz's testimony (1) that Klotz suspected Beckman and Cook were operating a Ponzi scheme, and (2) implying Cook and "Kiley brought in billions" and to Agent Schommer's testimony that (1) "the fraud was exposed" right after June 29, 2009, (2) Kiley provided a response in a civil case "post the time that the fraud had been discovered," and (3) Kiley's denials in an answer in the civil case were "false. They are lies."

In each case, Kiley argues the district court plainly erred by admitting improper opinion testimony, particularly by stating "a defendant's conduct [w]as 'fraud' or 'fraudulent.'" Spencer, 700 F.3d at 321-22 (rejecting the defendant's "contention that [the witness's] testimony usurped the jury's role as factfinder, and thereby created unfair prejudice" when the witness "did not express an opinion about whether [the defendant] had the requisite *mens rea* to commit fraud . . . or whether [the defendant's] actions were fraudulent"). Even if we assume Spencer suggests that a witness who concludes a defendant's actions were fraudulent usurps the jury's role, here, the witnesses used the word "fraud" only as a shorthand for the Ponzi scheme itself, which no one denies. The testimony did not "'affect [Kiley's] substantial rights, and . . . seriously affect[] the fairness, integrity, or public reputation of judicial proceedings.'" Big Eagle, 702 F.3d at 1130 (quoting Troyer, 677 F.3d at 358-59). The district court did not plainly err by failing to strike this testimony sua sponte.

-20-

Kiley also asserts the district court plainly erred by allowing testimony from an ex-wife and an ex-girlfriend as to his alleged drug use and inability to manage his finances. Kiley claims the evidence violated Federal Rules of Evidence 403 and 404. The government claims the questions about Kiley's ability to manage his finances were relevant to Kiley's assertions of his financial acumen, and the comment about drug use was blurted out unexpectedly from the ex-girlfriend. The district court did not plainly err by failing to strike the testimony sua sponte.[9]

## B.     Sufficiency of the Evidence

Beckman and Kiley appeal the district court's denial of their motions for acquittal on the grounds of insufficient evidence.[10] "We review the district court's decision to deny the motion for judgment of acquittal de novo. 'When reviewing the sufficiency of the evidence, we consider the evidence in the light most favorable to the verdict rendered and accept all reasonable inferences which tend to support the jury verdict.'" United States v. Bordeaux, 570 F.3d 1041, 1047 (8th Cir. 2009) (internal citation omitted) (quoting United States v. Ramirez, 362 F.3d 521, 524 (8th Cir. 2004)). "Evidence supporting conviction 'need not preclude every outcome other than guilty.'" United States v. Pierson, 544 F.3d 933, 938 (8th Cir. 2008) (quoting Ramirez, 362 F.3d at 524). "If any interpretation of the evidence would allow a reasonable-minded jury to find the defendant guilty beyond a reasonable doubt, we must uphold the verdict. This standard of review is very strict, 'and the jury's verdict is not to be lightly overturned.'" United States v. Teague, 646 F.3d 1119, 1122 (8th

---

[9]The defendants contend the district court's errors in admitting improper evidence, even if harmless individually, warrant reversal when viewed cumulatively. "Because we have not found multiple errors, harmless or otherwise, we must also reject this contention." United States v. Wilkens, 742 F.3d 354, 364 (8th Cir. 2014).

[10]Durand states he does not challenge the sufficiency of the evidence, yet he does appeal the district court's denial of a motion of acquittal, stating the district court committed "cumulative reversible error."

Cir. 2011) (internal citation omitted) (quoting <u>United States v. Hayes</u>, 391 F.3d 958, 961 (8th Cir. 2004)).

### 1. Beckman
#### a. No Knowledge

Beckman primarily claims he had no knowledge "that Cook and Pettengill ran a Ponzi scheme" until "the Phillips lawsuit" hit the papers.[11] A reasonable jury could have believed evidence to the contrary, including the following: the Briggs law firm May 2008 letter; the Morgan Lewis law firm June 2008 letter; testimony from Mendelson that in June 2008 he advised Beckman "there was the very strong potential [the currency program] was an unregistered public offering" and must be rescinded; Klotz's July 2008 email to Beckman advising the "investment program is riddled with illegalities"; Klotz's testimony he told Beckman in July 2008 the currency program "made no sense whatsoever," "a risk-free investment is ridiculous," and "the initial offering to the Oxford Global Advisors investors was likely illegal"; and Cook's August 2008 email to Beckman outlining a plan to cover their tracks when an outsider questioned their website's promise of a 10.5% fixed rate. Applying all inferences supporting the verdict, we accept the jury's conclusion that Beckman was aware of the scheme as it unfolded prior to July 2009.

#### b. The Olsons

Beckman was found guilty as charged in Counts 14 and 15, committing or aiding and abetting the commission of wire fraud, regarding his interactions with elderly victims Charlotte and Raymond Olson, whose trust lost almost $5 million. Beckman claims he had no intent to defraud the Olsons. Among other evidence

---

[11]In July 2009, numerous investors sued Cook, Durand, and many of the UBS and Oxford entities. <u>See</u> <u>Phillips v. Cook,</u> No. 0:09-cv-1732 (D. Minn. July 7, 2009) (complaint).

supporting the charges,[12] the government produced a letter ostensibly written by Raymond Olson transferring $1.975 million that ViaSource Funding Group, LLC (ViaSource) was to receive from Olson's Bear Stearns Securities Corp. (Bear Stearns) account to a new account not named in the letter, along with a letter dated the same day from Beckman to ViaSource directing the wire transfer of the Bear Stearns funds to Oxford Global Advisors, LLC. A substantial part of the $1.975 million was then transferred to other Oxford entities. Mr. Olson testified at trial he did not recall writing the letter and did not recall having heard of ViaSource. A reasonable jury could conclude Beckman intended to defraud the Olsons and prepared the letter to access and misappropriate the $1.975 million.

### c.    The NHL

Beckman was found guilty as charged in Counts 16 and 17, committing or aiding and abetting the commission of mail fraud, regarding two applications Beckman submitted in his effort to purchase an interest in the Minnesota Wild. The first application asked, "Have you ever been a party to any litigation, including litigation alleging harassment or discrimination? . . . If yes, attach Schedule G setting forth [additional information]." Beckman answered "yes" and attached Schedule G, but he did not include the fact that his mother sued him with regard to his handling of his grandfather's estate, his employer sued him for refusing to pay back a promissory note, and two convictions for drunk driving. Beckman claims he acted under the advice of counsel and the errors were immaterial. Beckman's counsel, Berman, did not corroborate Beckman's claim that she advised him to omit the incidents. As to the deficiencies in Beckman's financial disclosures, Beckman's evidence fails to "refute" the strong evidence of his intent to defraud. Barth testified at trial to substantially the same facts averred in his affidavit, outlining the serious

---

[12]SEC accountant Hlavacek testified in detail how Beckman misappropriated the proceeds from the viatical sales of two separate insurance policies, each for $1.975 million, as alleged in Counts 14 and 15.

fabrications Beckman provided as purported evidence of his self-worth. A reasonable jury could believe Berman and Barth, rather than Beckman, and find Beckman's omissions both intentional and material. See United States v. Gaona-Lopez, 408 F.3d 500, 505 (8th Cir. 2005) (finding credibility questions are the province of the jury).

### d.    Tax Counts

Finally, Beckman disputes the sufficiency of the evidence supporting his tax fraud convictions.[13]   Beckman maintains the government did not prove he acted willfully.  IRS Special Agent Anna Johnson testified as to Beckman's omissions of income for his 2007 and 2009 returns (Beckman did not file a return in 2008).  A reasonable jury could credit Special Agent Johnson's testimony and conclude Beckman acted willfully when in 2007 he submitted a tax return reporting a substantial negative income based on a loss from his interest in Oxford Global Advisors, LLC—even though he testified in a deposition that he did not contribute any capital of his own into the entity—resulting in a $328,126 tax refund rather than a $165,204 tax payment.  A reasonable jury could also conclude Beckman acted willfully when in 2009, in a self-prepared return, Beckman claimed a deductible theft loss of $1,498,853 due to a Ponzi scheme, which required Beckman to represent he had "no actual knowledge" of the fraud before it was made public.

### 2.    Kiley

Kiley admits he made "self-aggrandizing statements" as to "his professional credentials both on his website and in his radio show" that were "not true."  Like Beckman, Kiley claims "the government failed to prove that Mr. Kiley knew or understood the fraudulent nature of Cook's scheme," making his lies as to his financial success and abilities merely "puffery," not fraud.  A reasonable jury could have believed evidence to the contrary, such as Kiley's carefully integrated, false

---

[13]Beckman also summarily disputes his conviction on the money-laundering counts.  We do not reach this undeveloped argument. See Rotskoff, 438 F.3d at 854.

statements on his website, on the radio, in brochures, and in conversations about the safety of the currency program.  Kiley assured potential investors their money would be safe with him, intending to secure investors for the currency program without regard to whether the program would deliver what Kiley promised.

To take but one example, investor Joseph Kalina testified he listened to Kiley's radio show, "Follow the Money," in 2008.  Kalina heard Kiley advertise a minimum return on investment of ten to twelve percent and "pretty much guarantee" safety, with the ability to withdraw anytime.  Kalina called the phone number given on the radio show and talked with Kiley, who sent Kalina "a big folder on all the good things that's [sic] going to happen."  Kiley wrote to Kalina on "Universal Brokerage FX" letterhead, "The safety and integrity of customer funds on deposit are ensured [sic] by measures enacted by the Federal Government, various exchanges, and the firm itself.  Customer funds are held in **segregated** accounts providing safety, security and liquidity. . . . Each and every broker has gone through extensive testing, examination and personal screening by Universal Brokerage FX before he or she has received their license."  Kiley sent Kalina a brochure advertising the "Yield Enhancement Analysis Program" (YEAP) that "offers a fully protected principal. . . . The system objective is simple; the strategy aims to take advantage of the 'free money' policy in Japan. . . .  All currency risk is insured through other financial markets. . . .  The YEAP simply collects daily interest and utilizes other financial markets to eliminate currency fluctuation risk."  Relying on Kiley's representations made in the letter and the brochure, on the phone, and in person that his investment would be safe and insured, Kalina withdrew his money from an individual retirement account—and paid almost a ten percent penalty, which Kiley assured Kalina he would earn back in the currency program.  At the time Kalina invested with Kiley, Kiley was aware Kalina was retired and was investing all of his retirement savings, just over $100,000.  At the time of trial, $3,000 had been returned to Kalina.  Based on the evidence adduced at trial, a reasonable jury could have found Kiley knew of the

falsehoods he advanced—"the 'free money' policy in Japan"—about the scheme he promoted.

### C.    Kiley's Trial Attorney

At the district court, Kiley retained attorney H. Nasif Mahmoud to represent him.  Kiley now asserts he was denied his Sixth Amendment right to competent assistance of counsel at trial because "Mahmoud labored under multiple conflicts of interest while representing" Kiley.  Kiley also argues the district court's failure to address the conflicts violated his Fifth Amendment right to Due Process.

Count 23 in the indictment (Count 17 in the original indictment) charged that on July 7, 2009, Kiley engaged in money laundering via a "[w]ire transfer of $100,000.00 from the Basel Group, LLC, bank account at Associated Bank to the account of an attorney."  Well before trial, in a "motion for inquiry," the government apprised the district court that the attorney cited in Count 23 was Kiley's attorney, Mahmoud.  The government advised the district court (1) Mahmoud might be a necessary witness because he attended meetings and purportedly stayed at the mansion where the schemers conducted the business of the currency program for as much as three weeks in July 2009; (2) during that time, Cook told Mahmoud that Cook initiated the Count 23 wire transfer, not Kiley; (3) Mahmoud currently represented "Individual A," who would "certainly" be called as a trial witness; and (4) Mahmoud formerly represented "Individual B," a "likely" government witness. The government advised the district court to explore the potential conflict issues in order to ensure Kiley's Sixth Amendment right to counsel was protected.

In a strong response to the government's motion, Kiley stated Mahmoud was "not a necessary witness" because other attorneys were present at the meetings, and they could testify rather than Mahmoud.  Kiley stated the government's motion was "a transparent attempt to prevent Kiley from securing the attorney of his choice" and on five occasions suggested the district court "consider sanctions against the

government." Although Kiley was also represented by a local attorney, David Zins, Kiley suggested disqualifying Mahmoud would result in hardship because Zins was less experienced and knew less about the case than Mahmoud. Kiley also stated Individual A was not a necessary witness because he was "the wrong witness" and Mahmoud had represented "Individual B on a one time basis" "years before." Kiley went so far as to suggest the money-laundering count was included in the indictment in "an effort to keep Kiley's present defense counsel [Mahmoud] from representing Kiley."

A magistrate judge granted the government's motion for inquiry and heard argument on the matter. At the hearing, after explanation by the magistrate judge, Kiley waived his rights as to any conflict with Individual A, Steve Nortier, and Individual B, Thietje. Also at the hearing, Kiley personally volunteered, "I have the utmost confidence in Mr. Mahmoud in many areas. His veracity, his commitment." Kiley expressly "waive[d] any potential conflict of interest" and declared, "I want to keep Mr. Mahmoud."

After the hearing, Kiley filed written "waivers of potential conflicts of interest" as to Nortier and Thietje. The magistrate judge recommended Mahmoud not be disqualified because of Kiley's waivers and because Mahmoud was not a necessary witness, and the district court agreed.

Kiley now argues the district court erred by not considering the conflict inherent in Count 23 itself—that Kiley was convicted of a crime that implicated his attorney, Mahmoud. This potential conflict was not raised by the government in its motion for inquiry, nor raised by Kiley at the magistrate judge's hearing, nor addressed by the magistrate judge or the district court before trial. At trial, several witnesses testified as to Mahmoud's receipt of the charged wire transfer. Mahmoud asked a witness about it himself, referring to himself in the first person—Mahmoud asked Kiley's administrative assistant, "In July of 2009, about the time you sent that

wire to me, what was [Kiley's] condition from what you observed when he learned of the fraud?" Kiley now suggests the potential conflict regarding Count 23 was (1) so obvious the district court should have investigated the matter whether or not Mahmoud raised it on Kiley's behalf, and (2) so grave it violated Kiley's Fifth Amendment right to due process.

"Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest." Wood v. Georgia, 450 U.S. 261, 271, 272-73 (1981) (vacating and remanding on due process grounds where defendants "were represented by their employer's lawyer," and "[a]ny doubt as to whether the court should have been aware of the problem [wa]s dispelled by the fact that the State raised the conflict problem explicitly and requested that the court look into it"). In the context of an assertion of ineffective counsel due to multiple representation of co-defendants in state court,

> trial courts [must] investigate timely objections to multiple representation. But nothing in our precedents suggests that the Sixth Amendment requires state courts themselves to initiate inquiries into the propriety of multiple representation in every case. Defense counsel have an ethical obligation to avoid conflicting representations and to advise the court promptly when a conflict of interest arises during the course of trial. Absent special circumstances, therefore, trial courts may assume either that multiple representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist. . . . [T]rial courts necessarily rely in large measure upon the good faith and good judgment of defense counsel. . . . Unless the trial court knows or reasonably should know that a particular conflict exists, the court need not initiate an inquiry.

Cuyler v. Sullivan, 446 U.S. 335, 346-47 (1980) (footnotes omitted). Nevertheless, as we have stated,

-28-

The Supreme Court [has rejected the] argument that, where the trial judge has failed to make a Sullivan-type inquiry notwithstanding an apparent attorney conflict of interest, reversal is automatic regardless of whether the conflict affected the attorney's performance. . . . The Supreme Court [has] concluded that, where the trial court knew or reasonably should have known about a potential attorney conflict of interest and yet failed to make an inquiry, the petitioner, in order to void the conviction, must show that the conflict of interest had an adverse effect on his or her counsel's performance.

Koste v. Dormire, 345 F.3d 974, 975, 981-82 (8th Cir. 2003) (citing Mickens v. Taylor, 535 U.S. 162, 172-74 (2002)) (reviewing a petition for relief under 28 U.S.C. § 2254 asserting a conflict that did not involve multiple representation); see also Ausler v. United States, 545 F.3d 1101, 1102, 1104 (8th Cir. 2008) (reviewing a motion for relief under 28 U.S.C. § 2255 that did not involve multiple representation and stating, "[I]n cases involving a [district court's] failure to inquire into . . . potential conflicts [other than one attorney representing co-defendants, a] defendant [must] show that 'a conflict of interest actually affected the adequacy of'" his attorney's representation, as opposed to "Strickland prejudice" (quoting Mickens, 535 U.S. at 170-71 & nn.3, 4)).[14]

In this case, the district court relied on (1) Mahmoud's assurance that no conflict existed and his adamant response to the government's motion for inquiry and (2) Kiley's clear statement to the magistrate judge he wanted Mahmoud to represent him—"I want to keep Mr. Mahmoud." See Powell v. Alabama, 287 U.S. 45, 53 (1932) ("It is hardly necessary to say that the right to counsel being conceded, a

---

[14]To the extent later cases conflict with Ausler, see, e.g., Noe v. United States, 601 F.3d 784, 790 (8th Cir. 2010) ("[W]e have not yet determined whether [Sullivan's] presumed prejudice analysis extends beyond conflicts arising from multiple representation."), we must follow the earliest opinion, Ausler. See Mader v. United States, 654 F.3d 794, 800 (8th Cir. 2011) (en banc) (explaining we are bound by prior panel opinions).

defendant should be afforded a fair opportunity to secure counsel of his own choice."). Unlike Wood, the government's motion for inquiry did not apprise the district court of the Count 23 issue Kiley now raises. We therefore reject Kiley's due process challenge raised under the Fifth Amendment, and we find the district court was not required to address sua sponte the potential Count 23 conflict in the midst of this complex and lengthy trial.

As to Kiley's ineffective-assistance challenge, the district court has not heard argument on the alleged inherent conflict in Count 23. Because Kiley "must show that the" alleged "conflict of interest had an adverse effect on" Mahmoud's performance, Koste, 345 F.3d at 981, and the district court has not passed on this issue, we decline to address it on direct appeal in the first instance. Cf. United States v. Hubbard, 638 F.3d 866, 869 (8th Cir. 2011) ("'We will consider ineffective-assistance claims on direct appeal only where the record has been fully developed, where not to act would amount to a plain miscarriage of justice, or where counsel's error is readily apparent.'" (quoting United States v. Ramirez-Hernandez, 449 F.3d 824, 827 (8th Cir. 2006))); United States v. McAdory, 501 F.3d 868, 872-73 (8th Cir. 2007) (stating ineffective-assistance claims are ordinarily deferred to 28 U.S.C. § 2255 proceedings). Whether the alleged Count 23 conflict resulted in ineffective assistance by Mahmoud is more appropriately addressed in a § 2255 proceeding with the benefit of the fact-finding and appraisal by the trial judge, who is in a better position to assess Mahmoud's performance.

### D. Newly Discovered Evidence—Murder Plot

Several months before the start of trial, Pettengill met with Federal Bureau of Investigation (FBI) agents and told them Durand suggested to Pettengill they should arrange for Beckman to be murdered in order to collect on a key man life insurance policy on Beckman. Pettengill's comments were noted on an FBI "Form 302," dated November 3, 2011 (Form 302).

Over a year later, on December 21, 2012, the government alluded to the murder plot in its sentencing memorandum for Durand. On December 26, 2012, the government moved for an evidentiary hearing "at which the United States will prove by the preponderance of the evidence that, in December of 2009, Mr. Durand proposed to Mr. Pettengill that they arrange for the murder of Jason Bo-Alan Beckman in order to collect and split the proceeds of a life insurance policy on Beckman's life."

The government did not disclose the Form 302 to Beckman and Durand until December 28, 2012, more than six months after trial. In an email to the defendants' attorneys, the government stated it looked in its files for this Form 302 in preparation for sentencing. Not finding the Form 302, the government asked the FBI to review its files. The FBI delivered the Form 302 on December 27, 2012. The government explains the lack of disclosure "was a mistake" and "it intended to turn over all of its interview memoranda in this enormous case." On December 28, 2012, and December 30, 2012, Durand and Beckman, respectively, moved for a new trial based on the newly discovered Form 302 evidence.

A few days later, on January 3, 2013, the district court held an evidentiary hearing on the morning of the sentencing hearings. The district court denied Beckman's and Durand's motions for a new trial and later issued a memorandum opinion to that effect.

### 1.    Federal Rule of Criminal Procedure 33(b)

This court "review[s] the district court's denial of [a defendant's] motion for a new trial based on newly discovered evidence for abuse of discretion." United States v. Haskell, 468 F.3d 1064, 1076 (8th Cir. 2006); see also Fed. R. Crim. P. 33(b)(1).

A successful Rule 33(b) movant must show that:

(1)    the evidence [was] unknown or unavailable to the defendant at the time of trial;

(2)    the defendant [was] duly diligent in attempting to uncover it;

(3)    the newly discovered evidence [is] material; *and*

(4)    the newly discovered evidence . . . probably will result in an acquittal upon retrial.

United States v. Rubashkin, 655 F.3d 849, 857 (8th Cir. 2011) (alterations and emphasis in original). "[T]he standard in our circuit for a Rule 33 motion is clear and binding. The rule *requires* that the newly discovered evidence 'probably will result in an acquittal.'" Id. at 858 (internal citation omitted) (quoting United States v. Baker, 479 F.3d 574, 577 (8th Cir. 2007)).

The district court found Beckman failed to satisfy the last two elements for a Rule 33(b) motion because (1) the alleged murder plot occurred after the fraud ended, and so was immaterial, and (2) the Form 302 contained inculpatory, rather than exculpatory, statements as to Beckman, i.e., Pettengill and Beckman "knew the money was gone, and the plan was to blame Cook." The district court did not clearly err in its findings and did not abuse its discretion.

Beckman also states the district court erred because if Beckman had access to the Form 302 before trial, he may have reconsidered "his decision not to seek a severance from Durand" and might not have engaged in "'hands off' treatment of Durand" at trial. The district court did not explicitly address this argument in its order.

"Federal Rule of Criminal Procedure 14(a) vests the district court with authority to order severance if consolidation for trial appears to prejudice the government or a defendant. Nevertheless, there is a strong presumption against

-32-

severing trials." United States v. Kramer, 768 F.3d 766, 770 (8th Cir. 2014). Beckman does not allude to any prejudice he suffered by being joined as a co-defendant with Durand, nor does he delineate just what evidence he would have produced about Durand relevant to the time frame of the fraud had Beckman known about the alleged murder plot before trial. Thus, his argument is unsupported and without merit.

### 2.    Brady and Giglio Violations

Beckman and Durand argue the government's failure to produce the Form 302 violated the requirements of Brady v. Maryland, 373 U.S. 83, 87 (1963). "'To show a Brady violation, the defendant must establish that (1) the evidence was favorable to the defendant, (2) the evidence was material to guilt, and (3) the government suppressed evidence. . . . Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" United States v. Jeanpierre, 636 F.3d 416, 422 (8th Cir. 2011) (quoting United States v. Ladoucer, 573 F.3d 628, 636 (8th Cir. 2009)). "'We review de novo allegations of Brady violations.'" Mandacina v. United States, 328 F.3d 995, 1001 (8th Cir. 2003) (quoting United States v. McElhiney, 275 F.3d 928, 932 (10th Cir. 2001)).

Beckman also argues the government violated the requirements of Giglio v. United States, 405 U.S. 150, 153-55 (1972). "'Under [Giglio], the government must disclose matters that affect the credibility of prosecution witnesses. [F]or example, a defendant is entitled to know of a promise to drop charges against a key witness if that witness testifies for the government.' However, the nondisclosure of Giglio evidence only justifies a retrial if the withheld information is deemed material." United States v. Garcia, 562 F.3d 947, 952 n.7 (8th Cir. 2009) (second alteration in original) (internal citations omitted) (quoting United States v. Morton, 412 F.3d 901, 906 (8th Cir. 2005)).

-33-

### a. Beckman

Beckman claims the Form 302 was exculpatory because the evidence of a murder plot would "buttress[] his arguments about his lack of knowledge of any overall conspiracy." But the Form 302 actually is inculpatory on that issue, so this evidence was not favorable to Beckman, as Brady requires.

Second, Beckman states the "fact that Pettengill never disclosed the murder plot to Mr. Beckman . . . seriously undermines credibility and character." But Pettengill's admitted role in the scheme seriously affected his credibility from the beginning, and it is unclear how the revelation of another purported act of deception would have materially affected the jury's interpretation of Pettengill's testimony. Beckman has not established the withheld information is material, as both Brady and Giglio require.

### b. Durand

Durand first contends Pettengill's statement in the Form 302 that the "fund was doing great and had $40 million" supports his argument that the enterprise did not begin as a scam and that Durand reasonably believed the program was legitimate. Pettengill substantially testified to the $40 million balance at trial, and the Form 302 would have only amounted to cumulative evidence. Second, in the Form 302, Pettengill stated, "Swiss FX [a firm run by Pettengill and Durand] was pitched more correctly than the Oxford currency program. It was not pitched with a guaranteed rate." This information, too, came out at trial when Pettengill testified as to Swiss FX that he "wanted to have an organization that was actually compliant with the law." Neither assertion reasonably would have produced a different outcome, as Brady requires.

Third, and "[m]ost importantly," Durand conclusively states, "[s]howing the jury what the *government* knew and when they would have known it, was crucial. That missing piece of paper would more likely than not have caused a different

-34-

outcome with respect to the [c]onspiracy [c]ount [] against Mr. Durand." Finally, in his reply brief, Durand cites for the first time several more of Pettengill's statements in the Form 302 that Durand surmises might have led to exculpatory statements by Pettengill on cross-examination. Such conjecture does not meet the Brady materiality requirement.

### 3. Jencks Act

Beckman and Durand argue the government's failure to produce the Form 302 also violated the Jencks Act. See 18 U.S.C. § 3500. "After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified." Id. § 3500(b). This court "review[s] a district court's ruling under the Jencks Act for clear error." United States v. New, 491 F.3d 369, 376 (8th Cir. 2007). Assuming the Form 302 is a "statement" within the meaning of 18 U.S.C. § 3500(e), "[w]e will not overturn a conviction for noncompliance with the Jencks Act where there is no indication of bad faith on the part of the government, nor an indication of prejudice to the defendant." United States v. Douglas, 964 F.2d 738, 741 (8th Cir. 1992).

Even if Beckman or Durand could establish prejudice, neither has established bad faith on the part of the government. Beckman provides no argument whatsoever as to bad faith. Durand assumes bad faith simply from the non-disclosure itself, arguing the government did not produce the Form 302 because it was exculpatory as to him. On the contrary, it is hard to imagine Durand would not have objected and filed a motion in limine to exclude the Form 302 if it had been timely produced, considering the revelation of a possible murder-for-hire. Because the Form 302 is inculpatory as to both Beckman and Durand, the government had no obvious motive to exclude it. The district court did not clearly err by denying Beckman's and Durand's motion for a new trial based on a Jencks Act violation.

-35-

### 4. Impeachment

Finally, both Beckman and Durand argue the Form 302 would have provided impeachment material during cross-examination of Pettengill. Yet, generally, "new evidence which is merely cumulative or impeaching is not, according to the often-repeated statement of the courts, an adequate basis for the grant of a new trial." Mesarosh v. United States, 352 U.S. 1, 9 (1956) (internal quotation marks omitted); accord United States v. Burns, 495 F.3d 873, 875 (8th Cir. 2007) (explaining "impeachment evidence is rarely sufficient to entitle a defendant to a new trial"). The district court properly denied the motions for a new trial on this basis.

### E. Sentencing

"When we review the imposition of sentences, whether inside or outside the [United States Sentencing] Guidelines [U.S.S.G. or Guidelines] range, we apply 'a deferential abuse-of-discretion standard.'" United States v. Hayes, 518 F.3d 989, 995 (8th Cir. 2008) (quoting Gall v. United States, 552 U.S. 38, 41 (2007)). In reviewing a district court's sentencing decision, an appellate court "must first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the [18 U.S.C.] § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." Gall, 552 U.S. at 51. "When reviewing the district court's calculation of the sentencing guidelines advisory sentencing range, '[w]e review the district court's factual findings for clear error and its construction and application of the Guidelines de novo.'" United States v. Pappas, 715 F.3d 225, 228 (8th Cir. 2013) (alteration in original) (quoting United States v. Raplinger, 555 F.3d 687, 693 (8th Cir. 2009)). "Under an advisory Guidelines regime, sentencing judges are only required to find sentence-enhancing facts by a preponderance of the evidence." United States v. Garcia-Gonon, 433 F.3d 587, 593 (8th Cir. 2006). But see Alleyne v. United States, 570 U.S. ___, ___, 133 S. Ct. 2151, 2155 (2013) (holding "any fact that increases the mandatory minimum is an 'element' that must be submitted to the jury").

The Guidelines advise the district court to consider "all reasonably foreseeable acts and omissions of others in furtherance of [a] jointly undertaken criminal activity" such as "a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy." U.S.S.G. § 1B1.3(a)(1)(B) (Nov. 2012). "[T]he emphasis under § 1B1.3," however, "is the scope of the *individual defendant's* undertaking and foreseeability in light of that undertaking, rather than the scope of the conspiracy as a whole." United States v. Spotted Elk, 548 F.3d 641, 674 (8th Cir. 2008); see U.S.S.G. § 1B1.3, cmt. n.2. "[A] defendant's conviction for conspiracy does not automatically mean that every conspirator has foreseen the" amount of loss, number of victims, or number of insolvent victims "involved in the entire conspiracy; in addition to membership in the conspiracy, the district court must find the scope of the individual defendant's commitment to the conspiracy and the foreseeability of particular" fraudulent transactions "from the individual defendant's vantage point." Spotted Elk, 548 F.3d at 674. "'We review the district court's findings as to scope of the defendant's undertaking, foreseeability to the defendant, and furtherance of the conspiracy for clear error.'" United States v. Adejumo, 772 F.3d 513, 533 (8th Cir. 2014) (quoting Spotted Elk, 548 F.3d at 677).

### 1. Beckman

#### a. Advisory Guidelines Calculation

Beckman maintains the district court procedurally erred in calculating his advisory Guidelines range. First, Beckman claims the district court erred in calculating the amount of loss. At trial, the government introduced a detailed report listing the amount invested by each victim, totaling over $193 million. Beckman states he should not be accountable for the total amount because he was not responsible for the investments brought in via the radio shows or by any of the other schemers. See U.S.S.G. § 2B1.1(b)(1)(N) (increasing the offense level by 26 if the loss exceeded $100 million). For the same reason, Beckman contends he should not be responsible for over 250 victims generally, nor for over 100 victims whose

solvency was threatened. See id. § 2B1.1(b)(2)(C), (b)(15)(B)(iii). Beckman also alleges his personal clients were more sophisticated than the general pool of victims because many were wealthy and had invested with him before the currency program began.

Beckman's arguments are unavailing. Together with his fellow schemers, Beckman appeared on a radio show, gave public seminars, and produced brochures advertising the currency program with the objective of casting the victim-ensnaring net as wide as possible to all reaches of the general public. The evidence introduced at trial renders inconceivable Beckman's present contention that he could not reasonably foresee, nor did he commit to, the scope of the currency program. The district court did not clearly err in attributing the aggregate losses caused by the conspiracy to Beckman.

Second, Beckman argues the Olsons, who were in their nineties at the time of the trial, were not vulnerable victims. See id. § 3A1.1(b)(1) & cmt. n.2 (increasing the offense level by two "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim," including a victim "who is unusually vulnerable due to age"). Whether the Olsons were vulnerable victims is a factual determination we review for clear error. See, e.g., United States v. Fiorito, 640 F.3d 338, 351 (8th Cir. 2011). "As a group, older persons are more experienced investors, so it would be clear error to impose a § 3A1.1(b)(1) increase simply because some of the victims of a widespread investment scam were elderly." United States v. Anderson, 349 F.3d 568, 572 (8th Cir. 2003). Rather, "the enhancement . . . requires a fact-based explanation of why advanced age or some other characteristic made one or more victims 'unusually vulnerable' to the offense conduct, and why the defendant knew or should have known of this unusual vulnerability." Id. In Anderson, we decided the government's "breezy assertion" "that the instant scheme featuring the too good to be true, tax free, risk free, 12% rate of return investment, would have

-38-

little chance of success without such a vulnerable audience" fell "far short of the necessary showing." Id. at 573 n.3 (internal quotation marks omitted).

Charlotte Olson testified she held two college degrees and at one time had the "knowledge and ability and acumen" to manage her money herself. But Mrs. Olson suffered a stroke in 1998, and after that she was not "able to manage [her] money as [she was] before." The "stroke removed [her] memory[,] and [she] had a very difficult time getting it back." She also testified "the stroke ma[de her] more foggy" and made it "harder for [her] to make well-informed decisions about [her] money." The district court did not clearly err by finding Mrs. Olson was a vulnerable victim and that Beckman, who described her as "a long-standing client," knew or should have known of her vulnerable status.

Third, Beckman objects to an enhancement for a violation of a securities law by an investment advisor. See U.S.S.G. § 2B1.1(b)(18)(A)(iii) (requiring a four-level enhancement "[i]f the offense involved . . . a violation of securities law and, at the time of the offense, the defendant was . . . an investment adviser").[15] Beckman does not dispute the charged offenses involved a violation of securities law or that he was an SEC-registered investment advisor. Rather, Beckman claims he was not acting in the role of an SEC-registered investment advisor with regard to the currency program because he did not charge a fee, and thus was "an independent agent, a function that did not require . . . licensing." Beckman cites no case law in support of his claim, nor do we find any. We are persuaded by the reasoning of the Eleventh Circuit, which was not convinced by a defendant's arguments that the § 2B1.1(b)(18) enhancement did not apply because the defendant was not licensed. See United States v. Elia, 579 F. App'x 752, 755 (11th Cir. 2014) (unpublished per curiam) (reasoning that "the

---

[15]"A conviction under a securities law . . . is not required in order for subsection (b)(18) to apply. This subsection would apply in the case of a defendant convicted under a general fraud statute if the defendant's conduct violated a securities law." U.S.S.G. § 2B1.1(b)(18), cmt. n.14(B).

term 'investment adviser' does not require formal licensing" in the first instance); see U.S.S.G. § 2B1.1(b)(18)(A)(i)-(iii). The district court did not clearly err by finding Beckman was an investment advisor and applying the enhancement.

Fourth, Beckman denies the conspiracy and questions whether it involved sophisticated means. See id. § 2B1.1(b)(10)(C) (increasing the offense level by two if "the offense . . . involved sophisticated means"). "For purposes of subsection (b)(10)(C), 'sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." Id. § 2B1.1(b)(10)(C), cmt. n.8(B). "Conduct such as hiding assets or transactions, or both, through the use of fictitious entities [or] corporate shells . . . ordinarily indicates sophisticated means." Id. "'Even if any single step is not complicated, repetitive and coordinated conduct can amount to a sophisticated scheme.'" United States v. Huston, 744 F.3d 589, 592 (8th Cir. 2014) (quoting Fiorito, 640 F.3d at 351). "The enhancement applies when the offense conduct, viewed as a whole, was notably more intricate than that of the garden-variety offense." Adejumo, 772 F.3d at 531 (quoting United States v. Jenkins, 578 F.3d 745, 751 (8th Cir. 2009) (internal marks omitted)). "'We review the factual finding of whether a . . . scheme qualifies as sophisticated for clear error.'" Huston, 744 F.3d at 592 (alteration in original) (quoting United States v. Brooks, 174 F.3d 950, 958 (8th Cir. 1999)). Given the obviously complex nature of this financial crime, which involved "'repetitive and coordinated conduct,'" see id. (quoting Fiorito, 640 F.3d at 351), and defrauded hundreds of investors, the district court did not clearly err by finding the defendants' scheme involved sophisticated means.

Finally, Beckman asserts he did not obstruct justice. See U.S.S.G. § 3C1.1 (increasing the offense level by two for obstruction "related to . . . the defendant's offense of conviction"); id. cmt. n.4(B) (stating perjury is an example of obstruction). "A defendant commits perjury if, under oath, he or she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather

than as a result of confusion, mistake, or faulty memory." Adejumo, 772 F.3d at 535 (internal marks omitted) (quoting United States v. O'Dell, 204 F.3d 829, 836 (8th Cir. 2000)). "'We review a district court's factual findings in support of an obstruction of justice enhancement for clear error and its application of the sentencing guidelines to the facts *de novo*.'" Id. (quoting O'Dell, 204 F.3d at 836).

During the Phillips litigation, Beckman swore in an affidavit and testified to the court he and his wife invested over $6 million in the currency program, of which almost $4 million was his "earnings." At trial, Beckman also testified he invested millions of dollars with the currency program. In contrast, SEC accountant Hlavacek testified that at the most, Beckman invested only $44,000 into the currency program. The district court did not err by crediting Hlavacek's testimony and the evidence introduced at trial rather than Beckman's affidavit and testimony, and properly applied the obstruction of justice enhancement.

### b.      Comparison with Cook

Beckman argues the district court procedurally erred by failing to explain why Beckman's sentence was sixty months longer than Cook's, even though, according to Beckman, Cook was "[t]he acknowledged kingpin of the Ponzi scheme." See 18 U.S.C. § 3553(a)(6) (requiring a sentencing court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"). Beckman's argument fails because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges," and a district judge "necessarily g[ives] significant weight and consideration to the need to avoid unwarranted disparities" when he "correctly calculate[s] and carefully review[s] the Guidelines range." Gall, 552 U.S. at 54.

Beckman also ignores Cook's different status with regard to sentencing. First, Cook pled guilty, while Beckman proceeded with a lengthy, complex jury trial.

Second, Cook pled guilty to two crimes, aiding and abetting mail fraud and tax evasion, while a jury convicted Beckman of many more, including crimes unique to him concerning the Olsons and the NHL. As a result, Cook was not similarly situated with Beckman. See United States v. Williams, 624 F.3d 889, 897 (8th Cir. 2010) (finding "no procedural error in the district court's consideration of 18 U.S.C. § 3553(a)(6) [when] the two defendants were not similarly situated").

At Beckman's sentencing hearing, the district court said, "I have reviewed all the case law that is pertinent to this case from the Eighth Circuit Court of Appeals and of course the United States Supreme Court and most assuredly I have reviewed Title 18, 3553(a), and those provisions in fashioning the sentence that I will hand down in a few moments." The district court continued, "All four of you that I am going to be sentencing today, from Pettengill, to Durand, to Kiley to you [Beckman], were essential to the whole scheme, as was Trevor Cook, and for that you will be sentenced to a term of imprisonment that I believe is appropriate." The district court did not procedurally err when it considered § 3553(a)(6), and the district court adequately explained the sentences of the defendants in relation to each other, particularly considering the obvious disparities between Beckman and Cook.[16]

---

[16]Beckman urges us to remand for clarification of his sentence in relation to Cook, citing United States v. Cole, 721 F.3d 1016 (8th Cir. 2013), where the sentencing court sentenced Cole to three years probation when her advisory Guidelines range was 135 to 168 months imprisonment and her co-conspirators received "much harsher" sentences of 180 months and 90 months imprisonment. Id. at 1019, 1025. Noting "the magnitude of the downward variance" and that Cole's sentence was "a 'major departure' from the advisory Guidelines range," we "remand[ed] for the district court to more fully explain the defendant-specific facts and policy decisions upon which it relied in determining that the probationary sentence [was] 'sufficient, but not greater than necessary' . . . to achieve the sentencing objectives set forth in section 3553(a)." Id. at 1025 (quoting Gall, 552 U.S. at 50 and 18 U.S.C. § 3553(a)). Our remand in Cole was predicated upon the unique facts of that case and does not require the same result here, where Beckman received a well-considered and well-explained sentence of imprisonment.

### 2. Durand

Durand argues the district court procedurally erred in calculating his sentence, which "violate[s] the letter and spirit of 18 U.S.C. § 3553(a)," because his "culpability was exponentially less than that of the other defendants." In reviewing the district court's sentencing decision, again, we emphasize "the scope of the *individual defendant's*"— Durand's—"undertaking and foreseeability in light of that undertaking, rather than the scope of the conspiracy as a whole." Spotted Elk, 548 F.3d at 674; see U.S.S.G. § 1B1.3, cmt. n.2. We "focus . . . on acts, reasonably foreseeable to" Durand "even though committed by others, that furthered a criminal activity that he had agreed to undertake jointly with those others." Davison, 761 F.3d at 685. Again, "'[w]e review . . . for clear error.'" Adejumo, 772 F.3d at 533 (quoting Spotted Elk, 548 F.3d at 677).

Durand proposes he should not be responsible for all the losses attributed to the conspiracy because he claims he played a smaller role than his co-conspirators. See U.S.S.G. § 2B1.1(b)(1)(N). Durand claims he "was responsible for recruiting [only] 17 individuals who invested and lost less than seven million dollars." Alternatively, Durand suggests the district court should have calculated the loss as Durand's gain of $1.9 million. See id. § 2B1.1, cmt. n.3(B). Durand contends, "if he was part of a conspiracy, he joined it well into 2008," and he "solicited zero investors for the Cook-Kiley currency program after [he] was fired in early June of 2008."

The evidence presented at trial contradicts Durand's proposition. Durand admits he started soliciting investors for Cook through his radio show and by hosting seminars as early as 2005. Durand produced brochures, practically identical to Beckman's, advertising the currency program and making utterly false statements about the safety and liquidity of investors' funds. Durand forwarded names of investors to Cook, knowing Cook was a liar who purposely misled people by using the name "UBS." Although Durand now claims he was "fired" in June 2008, at the time, he stated he had moved out of the currency program's principal place of

business but "*nothing else has changed*." (Emphasis added). Durand stated he would "still do the radio, the newsletter, seminars and oh yes . . . still continue to be an owner of Oxford!!!"  An Oxford Global Advisor newsletter dated August 2008 containing articles by Beckman and Durand lists Durand as "Managing Director, Oxford Global Advisors" and directs investors to "[t]une in" to Durand's radio show "to tune up [their] portfolio[s]."[17]  The district court did not clearly err by finding the evidence adduced at trial, including Durand's radio shows, brochures, seminars, newsletters, advice to investors and personal gain, showed Durand personally understood and foresaw the scope of the scheme that wrought economic disaster on the investors.  The district court did not clearly err in finding Durand responsible for over $100 million in actual losses.  See U.S.S.G. § 2B1.1(b)(1)(N).

### 3.    Kiley

"Assuming that the district court's sentencing decision is procedurally sound, the appellate court should then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard."  Gall, 552 U.S. at 51. Kiley first argues his "sentence was substantively unreasonable because it placed too much weight on the Sentencing Guidelines' 'loss amount' enhancement under § 2B1.1(b)(1)(N), which adds 26 points to a defendant's offense level where 'actual losses' exceed $100,000,000."  Kiley states, "The government did not provide any evidence that the 'actual loss' suffered by the investors was 'reasonably foreseeable' by Mr. Kiley.  As such, it is not proper to attribute that loss to Mr. Kiley under the guidelines."  Kiley contends he was unaware the purpose of the scheme was to defraud the investors and "he did not know that the statements he made about the

---

[17]In his article, Durand wrote, "My desire to address the investor is dwarfed by my concern for the masses—those hard working Americans who exist from paycheck to paycheck, blissfully unaware of how close to the edge of economic disaster they reside."

currency program were . . . false." Based on sufficient evidence produced at trial, the jury found otherwise.

Second, Kiley theorizes his sentence violates the Eighth Amendment because "use of the loss amount enhancement to punish individuals involved in large financial crimes results in sentences that are excessive and disproportionate to the crime charged, and therefore serve no valid legislative purpose." Yet, "even 'assuming that a sentencing court *may* disregard [a guideline] on pure policy grounds,'" the United States Supreme Court has not held "'that a district court *must* disagree with any sentencing guideline, whether it reflects a policy judgment of Congress or the [Sentencing] Commission's characteristic empirical approach.'" United States v. O'Connor, 567 F.3d 395, 398 (8th Cir. 2009) (first alteration in original) (quoting United States v. Barron, 557 F.3d 866, 871 (8th Cir. 2009)). Kiley's policy argument did not compel the district court to accept his theory.

"'[W]here a district court has sentenced a defendant below the advisory guidelines range, it is nearly inconceivable that the court abused its discretion in not varying downward still further.'" United States v. McKanry, 628 F.3d 1010, 1022 (8th Cir. 2011) (alteration in original) (quoting United States v. Moore, 581 F.3d 681, 684 (8th Cir. 2009) (per curiam)). The district court did not abuse its discretion by applying the loss amount enhancement and then sentencing Kiley to 240 months imprisonment, well below his advisory Guidelines range of 3,360 months for all fifteen counts.

## F. Beckman's Motion to Strike

Twice in its brief, the government states Charlotte and Raymond Olson are now deceased. Beckman filed a motion to strike these references. Because the statements played no part in our analysis, we deny Beckman's motion as moot.

## III. CONCLUSION

We affirm the conviction and sentence of each defendant.

BYE, Circuit Judge, concurring in part and dissenting in part.

I agree in all respects with affirming the convictions and sentences of Jason Beckman and Gerald Durand. I believe Patrick Kiley's Sixth Amendment rights were violated at trial, however, because his counsel was laboring under a conflict of interest that adversely affected his representation of Kiley. As a result, I would reverse Kiley's conviction and remand for a new trial. I therefore respectfully dissent from Section II.C. of the majority's opinion.[18]

The district court never considered whether Kiley's trial counsel, H. Nasif Mahmoud, was operating under a conflict of interest while representing Kiley on the grounds that Mahmoud was directly implicated in one of Kiley's crimes. Count 23 of the Second Superseding Indictment charged Kiley with money laundering in connection with a 2009 wire transfer of $100,000 from one of Trevor Cook's fraudulent enterprises. The purported purpose of the wire transfer was to pay Mahmoud to represent the fraudulent enterprise and Kiley in a related civil case. Mahmoud attended meetings at the currency program's place of business in July 2009, purportedly to discuss the civil litigation. The government cross-examined Julie Gilsrud, Kiley's secretary, with the intent to show the wire transfer was done for Kiley's benefit, or at least with Kiley's approval. Mahmoud admitted during trial he received the $100,000 wire transfer. In closing argument, the government argued the wire transfer "was directed by Trevor Cook for the benefit of Pat Kiley. Pat Kiley had utilized Mr. Mahmoud in connection with a civil litigation. That $100,000 was for Kiley's benefit." The jury determined the funds Mahmoud received were

_____

[18]Because I would reverse Kiley's conviction, I would not reach the other trial and sentencing issues relevant to him.

laundered funds within the meaning of 18 U.S.C. § 1957, and found Kiley guilty of Count 23.

Kiley's current counsel – appointed to represent Kiley following the postponement of his initial sentencing hearing – argues Mahmoud's receipt of the laundered funds (as well as his presence at the currency program's place of business) could lead reasonable jurors to regard Mahmoud as a co-conspirator in the currency program. He further contends that where an attorney is implicated in his own client's crimes, a conflict necessarily exists because the client and attorney have divergent interests with respect to the factual and legal underpinnings of the charge, as well as the course of action to be taken in defending against the charge. See, e.g., United States v. Fulton, 5 F.3d 605, 611-13 (2d Cir. 1993) (indicating when an attorney is implicated in criminal activity sufficiently related to crimes charged against a client, an unwaivable conflict of interest exists and a *per se* violation of the Sixth Amendment occurs because the attorney's "fear of, and desire to avoid, criminal charges, or even the reputational damage from an unfounded but ostensibly plausible accusation, will affect virtually every aspect of his or her representation of the defendant").

Applying our decision in Ausler v. United States, 545 F.3d 1101 (8th Cir. 2008), the majority does not presume prejudice from Mahmoud's implication in the money laundering charge and automatically reverse Kiley's conviction. Instead, in this case where the district court failed to inquire into the potential conflict, the majority concludes Kiley must show the conflict actually affected the adequacy of Mahmoud's representation. See id. at 1104 (quoting Mickens v. Taylor, 535 U.S. 162, 170-71 & nn. 3, 4 (2002)). Based solely upon Mahmoud's assurance that no conflict existed, coupled with Kiley's statement to the magistrate judge that he wanted Mahmoud to represent him, the majority concludes "the district court was not required to address the potential Count 23 conflict in the midst of this complex and lengthy trial." Ante at 30.

-47-

I do not agree the majority's analysis is sufficient to address the issues raised by Kiley. First, I fail to see how a conflicted attorney's own assurance that no conflict exists should be relevant. But even assuming it is relevant, Mahmoud's assurance only pertained to the two potential conflicts the government raised in its motion for inquiry: 1) whether Mahmoud was a necessary witness because he was present at the July 2009 meetings; and 2) whether he had a potential conflict because he currently represented one government witness (Stephen Nortier) and formerly represented another government witness (Duke Thietje). Mahmoud's assurance did not address the conflict that matters – whether Mahmoud's implication in Kiley's crime, as the recipient of Count 23's laundered funds, adversely affected his representation of Kiley.

Similarly, Kiley's statement to the magistrate judge indicating he "want[ed] to keep Mahmoud" as his attorney did not address the Count 23 implication conflict. Kiley's statement responded solely to questions regarding Mahmoud's representation of Nortier and Thietje. See Mot. Tr. at 14-25, District Ct. Docket #127. Kiley was never questioned about the conflict stemming from Mahmoud's receipt of $100,000 in laundered funds, nor was he ever given the opportunity to knowingly and voluntarily waive that conflict, assuming it could be waived. See United States v. Lopesierra-Gutierrez, 708 F.3d 193, 201-02 (D.C. Cir. 2013) (concluding the conflict stemming from defense counsel's receipt of laundered funds could be knowingly and voluntarily waived, but only "where a stipulation bars presentation of incriminating testimony" and thus the jury never learns that defense counsel received laundered funds).

Kiley contends the possibility that Mahmoud's implication in Count 23 created a conflict "was sufficiently apparent . . . to impose upon the court a duty to inquire further," such that the failure to conduct the inquiry violated Kiley's Fifth Amendment due process rights. Wood v. Georgia, 450 U.S. 261, 272, 273 (1981). I do not find the majority's analysis – which appears to consist solely of an examination of the

-48-

district court's inquiry into *other* potential conflicts – particularly helpful in addressing that due process issue.

With respect to Kiley's claim that his Sixth Amendment rights were violated, the majority defers ruling on Kiley's ineffective-assistance-of-counsel claim until it has been presented in a subsequent proceeding under 28 U.S.C. § 2255. I would address the Sixth Amendment claim now. In my view, Mahmoud's ability to provide constitutionally effective representation to his client came to an end when the jury learned Mahmoud was the recipient of Count 23's laundered funds, was present at the currency program's place of business, and participated in discussions with Kiley's co-conspirators about the currency program. The jury's knowledge of Mahmoud's implication in Count 23 is a bell that has been rung, and cannot be undone for purposes of this trial by requiring the district court to hold an evidentiary hearing in a § 2255 proceeding.

In the situation we have here, where the jury knew Mahmoud received the laundered funds and was directly implicated in Kiley's charged conduct, it is at least debatable whether the conflict should be viewed as a *per se* violation of the Sixth Amendment and require automatic reversal of Kiley's conviction. See Fulton, 5 F.3d at 611-13 (applying a *per se* rule). But even assuming Kiley must demonstrate the conflict adversely affected Mahmoud's performance under Cuyler v. Sullivan, 446 U.S. 335, 350 (1980), I believe Kiley satisfies that standard.

In Dawan v. Lockhart, 31 F.3d 718 (8th Cir. 1994), our court addressed a conflict created by the same attorney representing both the defendant and his co-defendant in a burglary and theft-of-property prosecution. Stout, the co-defendant, pleaded guilty and gave a sworn statement implicating Dawan, the defendant. At Dawan's trial, after the attorney called Stout as a witness and he testified Dawan was not involved in the charged crimes, the prosecutor cross-examined Dawan about his prior sworn testimony implicating Dawan, specifically "highlight[ing] the fact that

-49-

Dawan's counsel was the attorney who had represented Stout when the statement was made." Dawan, 31 F.3d at 720. Stout then admitted he had previously implicated Dawan, but claimed he had lied under oath. Id.

Applying Cuyler's adverse effect standard, our court held Dawan's Sixth Amendment rights were violated because the jury learned – via the prosecutor's cross-examination – that Dawan's counsel had also represented a witness who changed his story. We said the "prosecutor's comments made Dawan's attorney look less credible and, by extension, made Dawan look less credible as well." Id. at 722.

Similarly, here the jury learned that Mahmoud received laundered funds derived from the fraudulent currency program. The jury also learned Mahmoud was present at the currency program's place of business and participated in discussions regarding civil litigation the co-conspirators faced. Based on these facts, it strains credulity not to expect a reasonable jury to consider whether Mahmoud himself was part of the criminal conspiracy. If it was even ostensibly plausible for the jury to believe Mahmoud was involved in the criminal conspiracy, I believe we should presume it would have "affect[ed] virtually every aspect of [Mahmoud's] representation of the defendant." Fulton, 5 F.3d at 613. At a minimum, however, Mahmoud's implication in Count 23, as the admitted recipient of funds the jury found to be laundered, would undoubtedly hurt Mahmoud's credibility with the jury, and by extension make Kiley look less credible as well. "This is a sufficient adverse effect for purposes of Cuyler." Dawan, 31 F.3d at 722.

I respectfully dissent from Section II.C. of the majority's opinion.

_____