# United States Court of Appeals

### For the Eighth Circuit

_____

No. 21-1211

_____

United States of America

*Plaintiff - Appellee*

v.

Felipe Noriega, Jr.

*Defendant - Appellant*

_____

No. 21-1324

_____

United States of America

*Plaintiff - Appellee*

v.

Edgar Javier Alcantar Cuevas, also known as Edgar Alcantar

*Defendant - Appellant*

_____

No. 21-1419

_____

United States of America

*Plaintiff - Appellee*

v.

Robert Alan McCleary, also known as Robert McCleary

*Defendant - Appellant*

_____

No. 21-1421

_____

United States of America

*Plaintiff - Appellee*

v.

Miguel Angel Alcantar Mercado, also known as Miguel Alcantar

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Southern District of Iowa - Central

_____

Submitted: January 10, 2022
Filed: May 26, 2022

_____

Before BENTON, SHEPHERD, and STRAS, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Appellants Felipe Noriega, Jr., Edgar Javier Alcantar Cuevas, Robert Alan McCleary, and Miguel Angel Alcantar Mercado, along with others not currently before this Court, were charged by superseding indictment with conspiracy to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1). McCleary

was also charged with distribution of a controlled substance, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(a). Appellants pled guilty to conspiracy to distribute a controlled substance, with the government agreeing to dismiss the distribution of a controlled substance charge against McCleary in exchange for his guilty plea. At sentencing, the district court[1] varied downward, sentencing each appellant to a term below the United States Sentencing Guidelines (Guidelines) range. Noriega, Alcantar Cuevas, McCleary, and Alcantar Mercado were sentenced to 72, 60, 180, and 204 months imprisonment, respectively. They now challenge their sentences, with Noriega additionally arguing that the district court erroneously denied his motion to suppress evidence obtained as a result of the traffic stop of his vehicle, an appeal right that he preserved in his plea agreement. Having jurisdiction pursuant to 28 U.S.C. § 1291, we affirm the district court.

## I.

The facts, as set forth in the unobjected-to portions of appellants' Presentence Investigation Reports (PSR) prepared by the United States Probation Office, reveal that appellants were part of a methamphetamine distribution conspiracy in which methamphetamine, sourced from Mexico, was distributed in Minnesota and Iowa. Appellants' roles were as follows. Alcantar Cuevas, a cousin of the supply source, received a shipment of ten pounds of methamphetamine from McCleary and, at the supply source's direction, delivered that methamphetamine to a customer. Alcantar Cuevas also collected drug proceeds and wired those proceeds, a total of approximately $8,740, to five different recipients in Mexico. The district court attributed a total of 10 pounds, or 4,536 grams, of a methamphetamine mixture to him.[2] McCleary worked as a drug distributor in the conspiracy, delivering the ten

---

[1]The Honorable Rebecca Goodgame Ebinger, United States District Judge for the Southern District of Iowa.

[2]In Alcantar Cuevas's PSR, 5,527.12 grams of actual or ice methamphetamine is attributed to him. However, at sentencing, Alcantar Cuevas objected to this

pounds of methamphetamine to Alcantar Cuevas and later delivering an additional ten pounds of methamphetamine to a co-conspirator not currently before this Court who, unbeknownst to McCleary, was cooperating with law enforcement. An undercover law enforcement officer also participated in this second transaction. The district court attributed a total of 20 pounds, or 9,072 grams, of actual or ice methamphetamine to McCleary. Alcantar Mercado, like Alcantar Cuevas, is a cousin of the supply source. Alcantar Mercado collected drug debts for the supply source and wired over $40,000 in drug proceeds from the United States to 22 individuals in Mexico. The district court attributed a total of 5,175.58 grams of actual or ice methamphetamine to him.[3]

Finally, Noriega acted as a delivery driver for the conspiracy, transporting methamphetamine to Iowa. The district court attributed 22 pounds, or 9,620 grams, of actual or ice methamphetamine to Noriega that originated from a November 15, 2019, traffic stop.[4] While Noriega was traveling through Colorado, Officer Michael

---

calculation, arguing that the government assumed the purity of the methamphetamine attributed to him based upon the methamphetamine seized from Noreiga, despite the fact that the ten pounds attributed to Alcantar Cuevas had not been tested for its purity. The district court agreed, finding that the government had not established by a preponderance of the evidence that Alcantar Cuevas was responsible for 5,527.12 grams of actual or ice methamphetamine. It concluded that Alcantar Cuevas should instead be held responsible for 4,536 grams of a methamphetamine mixture.

[3]Alcantar Mercado's PSR also attributed 1,340 grams of heroin to him, with a total converted drug weight, for the methamphetamine and heroin combined, of 104,851.60 kilograms. Although this heroin was not pertinent to the conspiracy to distribute charge, at sentencing, the district court considered it to be an aggravating factor.

[4]Noriega's PSR initially found that 28 pounds of a methamphetamine mixture was seized from Noriega's vehicle; at Noriega's suppression hearing, his lawyer mentioned Noriega's transport of 28, not 22, pounds of methamphetamine; and in the government's brief to this Court, it discusses the 28, rather than 22, pounds of

Miller of the Mesa County Sheriff's Department stopped Noriega after observing him traveling in the left-hand lane, a violation of Colorado law. See Colo. Rev. Stat. § 42-4-1005(1). Officer Miller later testified about this traffic stop, as did Special Agent Shane Gosnell of the Department of Homeland Security, who arrived after the stop was already in progress to assist Officer Miller. Upon Special Agent Gosnell's arrival, he took a "cover" position at the front passenger side of Officer Miller's patrol vehicle, which was parked behind Noriega's vehicle.

After stopping Noriega, Officer Miller approached Noriega's front passenger-side window and smelled an overwhelming "perfume-type odor" emanating from Noriega's front and rear passenger-side windows. When Noriega handed Officer Miller his driver's license, registration, and proof of insurance, Officer Miller observed that Noriega's hand was "trembling" and his face was "twitching." Officer Miller noticed that Noriega had a Nevada driver's license and license plate and a Las Vegas, Nevada address. Officer Miller testified that Las Vegas is a "transshipment center[]," i.e., a location where large quantities of narcotics are shipped to and then trafficked to states further inland.

Officer Miller testified that when asked about his travel plans, Noriega said that he was traveling to his brother's house for "maybe the weekend" despite not knowing his brother's address or how to find his brother. Officer Miller explained that Noriega appeared to be uncomfortable answering questions about his travel plans and repeatedly attempted to divert the conversation to other topics. Similarly, Special Agent Gosnell explained that when Officer Miller returned to his patrol vehicle to run Noriega's driver's license, registration, and proof of insurance, he mentioned that Noriega was "overly nervous," was providing "vague and

---

methamphetamine attributable to Noriega. However, Noriega's PSR then explained that following a laboratory analysis of the methamphetamine seized from Noriega's vehicle, 9,620 grams, or approximately 22 pounds, of actual or ice methamphetamine were attributable to Noriega. And, at sentencing, the district court discussed the "9.7 kilograms, approximately 22 pounds" of methamphetamine attributable to Noriega. Therefore, we accept the 22-pound amount.

implausible travel plans," and a "strong perfume-like odor [was] coming from the vehicle."

Seeing that Noriega's license was valid and there were no outstanding warrants for him, Officer Miller returned to Noriega's front passenger-side window. Officer Miller testified that, at this time, he noticed that the "perfume" scent had dissipated. Officer Miller returned Noriega's driver's license, registration, and proof of insurance and told him that he was "good to go." Noriega thanked Officer Miller and put his vehicle into gear.

However, before Noriega pulled away, Officer Miller asked Noriega if he was carrying any narcotics. Noriega said no, so Officer Miller asked to search Noriega's vehicle. Noriega expressed his confusion, telling Officer Miller that he thought that he was free to go. This exchange continued, with Noriega asking if he was required to consent to a search and Officer Miller telling Noriega that he had a drug dog in his patrol vehicle. Eventually, Officer Miller directed Special Agent Gosnell to remove the drug dog from the patrol vehicle. Officer Miller testified that upon seeing the dog, Noriega agreed to a dog sniff around the perimeter of his vehicle. Officer Miller testified that Noriega asked to exit the vehicle prior to the dog sniff, which Officer Miller allowed, and according to Officer Miller's testimony, upon Noriega's exit, Noriega's legs were visibly "shaking." The dog alerted Officer Miller to the driver-side lower rear door seam. Officer Miller testified that he asked Noriega if he could search the interior of Noriega's vehicle and Noriega agreed.

The search of Noriega's vehicle revealed 22 packages containing a total of 22 pounds of actual or ice methamphetamine. Noriega explained that he had been hired to deliver methamphetamine to Des Moines, Iowa, and was to be paid $400 per pound of methamphetamine transported. Officer Miller detained Noriega, and Noriega was then transported to Iowa. In a post-Miranda[5] interview, Noriega consented to a search of his phone, and on the phone, investigators found

---

[5]Miranda v. Arizona, 384 U.S. 436 (1966).

photographs of receipts for wire transfers that Noriega had received as payment for his transport of the methamphetamine. While searching Noriega's phone, investigators also saw that one of Noriega's "handlers" had sent Noriega an address to which Noriega was to deliver the methamphetamine. That address belonged to one of Noriega's co-conspirators not currently before this Court.

Noriega later filed a motion to suppress the methamphetamine found pursuant to the stop and search of his vehicle, along with any other evidence derived from that stop, including his subsequent admissions. In this motion, Noriega argued that suppression was appropriate because Officer Miller did not have reasonable suspicion to justify the extension of the traffic stop—a violation of Noriega's Fourth Amendment rights—and evidence recovered subsequent to the illegal search was fruit of the poisonous tree.

The district court held a suppression hearing and received testimony from both Officer Miller and Special Agent Gosnell. Officer Miller testified about his experience and training, explaining that he had been an officer with the Mesa County Sheriff's Department since 1992 and had worked in a patrol or drug interdiction capacity for the Western Colorado Drug Task Force since 1999. Officer Miller estimated that he has completed over 1,000 hours of drug interdiction training and has conducted thousands of traffic stops, during which he has seized thousands of pounds of narcotics, including methamphetamine. Officer Miller also acknowledged that he has been recognized on local, state, and national levels for his drug interdiction work.

The district court ultimately denied Noriega's motion to suppress. First, the district court found that, in light of Officer Miller's experience and training, his testimony was credible. It then concluded that after Officer Miller returned Noriega's driver's license, registration, and proof of insurance, the encounter was consensual, meaning that Noriega was not seized for purposes of the Fourth Amendment, but that even if Noriega was seized, "the facts testified to . . . provide reasonable suspicion for the ongoing investigation of illegal narcotics trafficking."

-7-

II.

We first address Noriega's argument that the district court erred in denying his motion to suppress. "In the motion-to-suppress context, we review a district court's legal conclusions de novo and its factual findings for clear error." United States v. Callison, 2 F.4th 1128, 1131 (8th Cir. 2021); see also United States v. Leon, 924 F.3d 1021, 1025 (8th Cir. 2019) (requiring that we "giv[e] due weight to the inferences of the district court and law enforcement officials" (citation omitted)).

Noriega argues that the extension of his traffic stop was not supported by reasonable suspicion and was therefore unlawful and, because evidence was obtained as a result of that unlawfully extended traffic stop, suppression is appropriate. The government responds that after Officer Miller returned Noriega's driver's license, registration, and proof of insurance, the encounter between Officer Miller and Noriega became consensual, meaning that Noriega was not "seized" within the purposes of the Fourth Amendment.

We need not decide whether a seizure occurred because, even assuming that Noriega *was* seized, the traffic stop was not unlawfully extended. "A seizure justified only by a police-observed traffic violation . . . 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." Rodriguez v. United States, 575 U.S. 348, 350-51 (2015) (second and third alterations in original) (citation omitted)). "To extend a routine traffic stop, an officer needs reasonable suspicion of additional criminal activity. Reasonable suspicion requires 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant' a brief investigative stop." Callison, 2 F.4th at 1132 (citations omitted); see also United States v. Englehart, 811 F.3d 1034, 1040-41 (8th Cir. 2016) ("In the normal course, once the officer finishes the tasks involved with the traffic violation 'the purpose of the traffic stop is complete and further detention of the driver or vehicle would be unreasonable, unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify further detention or unless the continued

-8-

encounter is consensual.'" (citation omitted)). "The reasonable suspicion inquiry asks 'whether the detaining officer has a particularized and objective basis for suspecting wrongdoing." United States v. Sanchez, 955 F.3d 669, 674 (8th Cir. 2020) (citation omitted). "[O]ur review on this issue looks to the totality of the circumstances, 'allow[ing] officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them.'" United States v. Dortch, 868 F.3d 674, 680 (8th Cir. 2017) (second alteration in original) (quoting United States v. Arizona, 534 U.S. 266, 273 (2002)).

Here, Officer Miller's testimony confirms that he had reasonable suspicion to extend the stop based on "specific and articulable facts," Callison, 2 F.4th at 1132 (citation omitted), that "occurred during the traffic stop," Englehart, 811 F.3d at 1040 (citation omitted). Noriega was traveling from Las Vegas, Nevada, a location known to Officer Miller as a common origin point for narcotics. Additionally, Noriega's demeanor was suspicious; he was visibly "shaking," "twitching," and "trembling," his mouth was noticeably dry, he appeared increasingly uncomfortable when pressed about his travel plans, and he attempted to change the topic of conversation, directing Officer Miller away from questions regarding his destination. Officer Miller also explained that, because a strong fragrance was coming from Noriega's vehicle at the outset of the stop but dissipated over the stop's duration, he suspected that Noriega had sprayed a substance to mask the scent of narcotics, a tactic that, in his experience, is commonly used by narcotics traffickers to conceal their narcotics. Officer Miller testified about his extensive experience and training, which he was allowed to "draw on," "mak[ing] inferences from and deductions about" Noriega's involvement in the transportation of narcotics. See Dortch, 868 F.3d at 680 (citation omitted).

Viewing these facts cumulatively and considering Officer Miller's extensive experience and training, we find that he had reasonable suspicion to extend the stop of Noriega. See, e.g., United States v. Pacheco, 996 F.3d 508, 512 (8th Cir. 2021) (finding reasonable suspicion to extend stop based on nervousness and odd

responses to "routine questions about travel plans"); United States v. Fuse, 391 F.3d 924, 929 (8th Cir. 2004) (finding reasonable suspicion to extend stop based on trooper's experience in highway drug interdiction and his testimony regarding vehicle's "strong odor of air freshener," driver's unusual nervousness and unusual explanation of his travel plans, and driver's origin state being "a 'source state' for illegal narcotics"). Because Officer Miller's extension of the stop was lawful, suppression of the evidence obtained as a result of that extension is inappropriate. Therefore, discerning no error, we affirm the district court's denial of Noriega's motion to suppress.

## III.

Next, we consider the substantive reasonableness arguments raised by Noriega, McCleary, and Alcantar Mercado, reviewing the substantive reasonableness of their sentences for abuse of discretion. See United States v. Carnes, 22 F.4th 743, 750 (8th Cir. 2022). An abuse of discretion occurs where a district court "(1) fails to consider a relevant factor that should have received significant weight; (2) gives significant weight to an improper or irrelevant factor; or (3) considers only the appropriate factors but in weighing those factors commits a clear error of judgment." United States v. Ballard, 872 F.3d 883, 885 (8th Cir. 2017) (per curiam) (citation omitted). However, "[a] district court has 'wide latitude' to assign weight to give[n] factors, and '[t]he district court may give some factors less weight than a defendant prefers or more weight to other factors, but that alone does not justify reversal.'" Carnes, 22 F.4th at 751 (second and third alterations in original) (citation omitted); see also United States v. Beckman, 787 F.3d 466, 499 (8th Cir. 2015) ("[W]here a district court has sentenced a defendant below the advisory guidelines range, it is nearly inconceivable that the court abused its discretion in not varying downward still further." (alteration in original) (citation omitted)).

A.

First, we address the substantive reasonableness of Noriega's sentence. Noriega's PSR, which applied a two-level reduction in the Guidelines offense level for Noriega's role as a minor participant and a three-level reduction for Noriega's acceptance of responsibility, calculated a total offense level of 29 and a criminal history category of II, which resulted in a Guidelines range of 97 to 121 months imprisonment. At sentencing, the district court recognized that although Noriega qualified for a safety valve reduction pursuant to 18 U.S.C. § 3553(f), USSG § 5C1.2(a) had not been amended to reflect the safety valve reduction recognized by § 3553(f). The district court nevertheless varied downward as if the provision were applicable, recalculating Noriega's total offense level as 27, which resulted in a Guidelines range of 78 to 97 months imprisonment. Ultimately, the district court varied downward further, sentencing Noriega to 72 months imprisonment with a 3-year term of supervised release.

Noriega argues that the district court imposed a substantively unreasonable sentence by declining to vary downward based on his policy disagreement with the Guidelines' treatment of a mixture of methamphetamine as opposed to pure methamphetamine. However, we have frequently stated that while a district court may vary from the Guidelines based on a policy disagreement, it is not required to do so. See United States v. Sharkey, 895 F.3d 1077, 1082 (8th Cir. 2018) (per curiam); see also United States v. Binion, 801 F. App'x 459, 462 (8th Cir. 2020) (per curiam) ("[W]hile the district court could have granted a downward variance based on a disagreement with the Guidelines' treatment of methamphetamine purity, it had the discretion to decline to do so." (citation omitted)).

Noriega also contends that the district court abused its discretion in weighing the 18 U.S.C. § 3553(a) factors. Specifically, he believes that the district court failed to consider or give adequate weight to his personal characteristics and history, arguing that he is young, is part of a close-knit, supportive family, is in a long-term, stable relationship with his partner, has children with that partner, and has a

-11-

methamphetamine addiction, which caused him to become involved in this conspiracy, jeopardizing the things in his life that he values, such as his family and children. Noriega also briefly addresses the other § 3553(a) factors. However, reversal is not appropriate simply because the district court did not weigh the § 3553(a) factors as Noriega preferred. See Carnes, 22 F.4th at 751; see also United States v. Farmer, 647 F.3d 1175, 1180 (8th Cir. 2011) ("A district court's choice to assign relatively greater weight to the nature and circumstances of the offense than to the mitigating personal characteristics of the defendant is well within its wide latitude in weighing relevant factors."). Moreover, "it is nearly inconceivable" that the district court abused its discretion in sentencing Noriega to a below-Guidelines term of imprisonment. See Beckman, 787 F.3d at 499 (citation omitted). Thus, we find that Noriega's sentence was substantively reasonable and affirm his sentence.

B.

We next consider the substantive reasonableness of McCleary's sentence. McCleary's PSR calculated a total offense level of 35, which included a three-level reduction for his acceptance of responsibility, and a criminal history category of II. This calculation resulted in a Guidelines range of 188 to 235 months imprisonment. At sentencing, the district court varied downward, sentencing McCleary to 180 months imprisonment with a 5-year term of supervised release.

McCleary, born in 1962, asserts that his sentence is substantively unreasonable because, although he was sentenced to 180 months imprisonment, his advanced age effectively renders the term a life sentence. However, the district court recognized this argument below, explaining that it was "concerned about protecting the public and providing adequate deterrence" but had chosen to vary downward after "tak[ing] into consideration the current conditions of COVID-19 and the challenges of serving time during this period and the defendant's age at 59 years old."

McCleary also argues that the district court overlooked, or placed insufficient weight on, his "lesser role" in the offense. Despite the fact that McCleary characterizes himself as being a "mere courier and waypoint holder in possession for a manager or supervisor co-conspirator," the district court found that the amount of methamphetamine attributed to McCleary was large. He additionally characterizes himself as an "unsophisticated user of methamphetamine who was enlisted for a fee to make at least one delivery run," but the district court found that this claim was undermined by the fact that, since 2000, he had "consistent[ly] participat[ed] in methamphetamine distribution," a fact which the district court found to be particularly aggravating. McCleary suggests that the district court improperly used his prior convictions against him despite the fact that he did not qualify as a career offender, but the district court acknowledged that McCleary was not a career offender, stating, "[T]his is a continuation of a pattern. Because of the age of the 2000 conviction, the defendant doesn't qualify as a career offender, but the age also means that it isn't used to elevate the applicable guideline range in any way." The district court explained that its "concern" was "that this is still happening, which suggests that deterrence and protection of the public require a significant sentence." Like Noriega, McCleary is unhappy with how the district court weighed the § 3553(a) factors, but that is insufficient to demonstrate any abuse of the district court's discretion, and accordingly, we affirm McCleary's sentence. See Carnes, 22 F.4th at 751; see also Beckman, 787 F.3d at 499.

C.


Finally, we consider Alcantar Mercado's claim that his sentence is substantively unreasonable. His PSR, after applying a three-level reduction for his acceptance of responsibility, calculated a total offense level of 35 and a criminal history category of III, which resulted in a Guidelines range of 210 to 262 months imprisonment. At sentencing, the district court varied downward and sentenced Alcantar Mercado to 204 months imprisonment with a 5-year term of supervised release. He now argues that his sentence is substantively unreasonable because although he was not eligible for a mitigating role reduction, he nevertheless played

-13-

a limited role in the conspiracy. However, the district court emphasized that not only were 5.1 grams of actual or ice methamphetamine attributed to Alcantar Mercado, but he was also responsible for a large amount—over 1,300 grams—of heroin. In fact, 90,000 kilograms or more of a converted drug weight were attributed to Alcantar Mercado, which the district court summarized as meaning that "there have been multiple drugs that are converted to a common level." The district court also found Alcantar Mercado's criminal history aggravating, noting that although it was "modest . . . comparatively," it was still "of concern" because he had previously violated the terms of his probation.

Like Noriega and McCleary, Alcantar Mercado also argues that the district court improperly weighed the § 3553(a) factors. However, as we have already explained, the simple fact that a defendant disagrees with how the district court weighed the § 3553(a) factors is insufficient to establish that the district court abused its discretion. See Carnes, 22 F.4th at 751. Therefore, we find that Alcantar Mercado's sentence is substantively reasonable and affirm that sentence. See Beckman, 787 F.3d at 499.

IV.

Unlike the other appellants, Alcantar Cuevas's argument is one of procedural error rather than substantive unreasonableness. He contends that the district court procedurally erred by denying him a mitigating role reduction pursuant to USSG § 3B1.2(b) and, consequently, by not applying a three-level reduction pursuant to USSG § 2D1.1(a)(5).

After applying a two-level safety valve reduction, a two-level mitigating role reduction, and a three-level reduction for Alcantar Cuevas's acceptance of responsibility, Alcantar Cuevas's PSR calculated a total offense level of 27 and a criminal history category of I. The government objected to the PSR's application of a two-level mitigating role reduction and argued that Alcantar Cuevas's total offense level should instead be 29, resulting in a Guidelines range of 87 to 108 months

-14-

imprisonment. At sentencing, the district court agreed with the government and found that Alcantar Cuevas was ineligible for a two-level mitigating role reduction. Alcantar Cuevas also objected to the PSR, arguing that the government had not proved by a preponderance of the evidence that the methamphetamine attributed to him was actual or ice methamphetamine, as opposed to a methamphetamine mixture. The district court agreed and found that 4,536 grams of a methamphetamine mixture was attributable to Alcantar Cuevas. After sustaining these objections, the district court recalculated Alcantar Cuevas's total offense level, applying a two-level safety valve reduction and a three-level reduction for Alcantar Cuevas's acceptance of responsibility. The district court calculated a total offense level of 29 and a criminal history category of I, which resulted in a Guidelines range of 87 to 108 months imprisonment. The district court then varied downward, sentencing Alcantar Cuevas to 60 months imprisonment with a 3-year term of supervised release.

"We review the district court's fact-findings with respect to a participant's role in the offense for clear error." United States v. Surratt, 172 F.3d 559, 567 (8th Cir. 1999). "It is well-established that a district court's determination of whether a defendant was a minor participant may only be reversed if clearly erroneous." United States v. Johnson, 358 F.3d 1016, 1017 (8th Cir. 2004). "The defendant has the burden of proving he played a minor role." United States v. Godinez, 474 F.3d 1039, 1042 (8th Cir. 2007). "A defendant may be eligible for the [USSG] § 3B1.2(b) reduction if his culpability for the relevant conduct is relatively minor compared to that of other participants, but the mere fact that a defendant is less culpable does not entitle him to the reduction." United States v. Johnson, 408 F.3d 535, 538 (8th Cir. 2005) (citation omitted). When deciding whether a mitigating role reduction was appropriate, we "compare[] 'the acts of each participant in relation to the relevant conduct for which the participant is held accountable' and measure[] 'each participant's individual acts and relative culpability against the elements of the offense.'" Id. at 538-39 (citation omitted).

Here, the district court found that a § 3B1.2(b) reduction was inappropriate because Alcantar Cuevas "played multiple roles within a very large drug trafficking

conspiracy" and "work[ed] directly with the source of supply from Mexico to both transfer money and to distribute large-scale methamphetamine into Iowa and Minnesota." We agree. Alcantar Cuevas was tasked with collecting drug proceeds and wiring those proceeds to multiple recipients in Mexico. In fact, Alcantar Cuevas wired over $8,000 from the United States to Mexico. He has not shown that he played only a minor role in this conspiracy, and the district court did not clearly err in not applying a two-level mitigating role reduction pursuant to § 3B1.2(b) and, consequently, by not applying a three-level reduction pursuant to § 2D1.1(a)(5). See Johnson, 408 F.3d at 538.

V.

Finding no error, we affirm the judgment in each of these appeals.

_____