# United States Court of Appeals
## For the Eighth Circuit

_____

No. 23-1012
_____

United States of America

*Plaintiff - Appellee*

v.

Chad Anthony Betts

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Southern District of Iowa - Central
_____

Submitted: September 20, 2023
Filed: December 14, 2023
_____

Before SHEPHERD, KELLY, and STRAS, Circuit Judges.
_____

SHEPHERD, Circuit Judge.

Chad Betts pled guilty to being a felon in possession of a firearm and ammunition following a traffic stop during which state troopers recovered a loaded handgun and methamphetamine. After preserving the right in his plea agreement,

Betts now appeals the district court's[1] denial of his motion to suppress, arguing that reasonable suspicion did not exist to extend the traffic stop. Having jurisdiction under 28 U.S.C. § 1291, we affirm the denial of the motion to suppress.

I.

On June 3, 2021, at 5:50 p.m., Iowa State Patrol Trooper Spencer Baltes observed Betts narrowly pass a semi-truck without using a turn signal on I-80 in Dallas County, Iowa. Baltes initiated a traffic stop and approached Betts's vehicle from the front passenger side, where Betts's niece Macey Wignall was seated. Betts produced his license and registration but explained that his insurance had lapsed. Due to the noise of passing traffic, Baltes asked Betts to sit with him in his patrol vehicle, which Betts agreed to do.

During this initial encounter, Baltes observed a torch-style lighter on the floorboard of the front passenger seat. Baltes knew that torch-style lighters were often used to heat drugs like methamphetamine. Looking through Betts's back passenger window as he returned to the patrol car, Baltes saw several shopping bags, including new clothes and shoes. He also observed that Betts had "extremely rotting teeth," and that, unlike Wignall, Betts was speaking quickly, sweating profusely, and was "very fidgety." Moreover, Betts's rapid, shallow breathing was so stark that Baltes could hear it. Based on his years of experience and training in law enforcement, Baltes knew these traits were consistent with methamphetamine use.

Once they were seated in the patrol vehicle, Baltes asked Betts about his travel plans. Betts explained that he had been driving to Las Vegas for a few days of vacation with Wignall, but that they turned around in Nebraska when he heard that pet-sitting arrangements for his pets had fallen through in Marshalltown, Iowa. Upon further questioning, Betts explained that he was unemployed and thus could

---

[1]The Honorable Stephen H. Locher, United States District Judge for the Southern District of Iowa.

not afford to insure his vehicle. During their conversation, Baltes observed that Betts's breathing was still rapid and shallow. Betts continued to sweat, even though the patrol vehicle's air conditioning was running.

Baltes testified that Betts's plans made him suspicious. Baltes knew that Las Vegas was a collection point for drug trafficking, and he thought it was an unusually distant, "extremely uneconomical" destination for only a few days of vacation. He also knew that I-80 was a significant thoroughfare for drug activity. Moreover, he found it suspicious that Betts would abruptly turn around in the middle of a long drive from Iowa to Las Vegas because of pet-sitting issues without first trying to find a replacement sitter. Still in the patrol vehicle, Baltes ran Betts's driver's license. He discovered that Betts was on parole for possession and delivery of methamphetamine, possession of a controlled substance, and driving while barred. According to Baltes, he now suspected that Betts was a methamphetamine user and was likely in possession of it.

Baltes then returned to Betts's vehicle to speak with Wignall. She declined to provide identification but told Baltes that she and Betts had taken a one-day trip to an outlet mall in Council Bluffs, Iowa. She made no mention of a Las Vegas vacation.

At approximately 6:00 p.m., Baltes returned to his patrol car to have Betts complete the digital paperwork for a traffic warning. Baltes inquired further about Betts's and Wignall's travel plans, at which time Betts said that he and Wignall had stopped at the Nebraska Crossing outlet mall near Omaha. After running Wignall's name, Baltes learned that she was married, lived 20 minutes from Marshalltown, and had prior drug-related convictions and an eluding charge. This raised Baltes' suspicions further: not only did Betts and Wignall give conflicting accounts of their travel plans, but it was unclear why Wignall's spouse could not watch Betts's pets, why Betts could not afford insurance but would buy new clothes and shoes, or why Betts made the pet-sitting sound like an emergency despite stopping to shop on his return.

While the traffic warning printed, Baltes asked Betts screener questions about contraband and whether a drug dog would alert to his vehicle. Betts denied the existence of any contraband but "appeared very triggered" by the drug dog question, equivocating on his answer. Around 6:05 p.m., Baltes radioed for the nearest canine unit, which arrived approximately 40 minutes later. After the drug dog alerted to Betts's vehicle, troopers searched it and recovered a loaded .380 caliber handgun, a six-round magazine, and 1.2 grams of methamphetamine with related paraphernalia. After being read his Miranda[2] warnings, Betts admitted the gun and drugs were his.

Betts was indicted for being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). He moved to suppress the evidence gathered from his vehicle and the statements he made to Baltes after the traffic warning was issued, arguing that Baltes lacked reasonable suspicion to extend the traffic stop and wait for the drug dog. The district court assumed for the sake of argument that the traffic stop was extended when Betts completed the digital paperwork and Baltes called for the drug dog, but found that reasonable suspicion existed at that time for Baltes to extend the stop. Accordingly, it denied Betts's motion to suppress. Betts then entered a conditional guilty plea, preserving his right to appeal the denial of his motion. He was sentenced to 51 months' imprisonment, and the instant appeal followed.

## II.

"When reviewing the denial of a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions de novo." United States v. Gonzalez-Carmona, 35 F.4th 636, 640 (8th Cir.) (citation omitted), cert. denied, 143 S. Ct. 391 (2022). "We may affirm the district court's denial of a motion to suppress on any ground the record supports." United States v. Murillo-Salgado, 854 F.3d 407, 414 (8th Cir. 2017) (citation omitted).

---

[2]Miranda v. Arizona, 384 U.S. 436 (1966).

Betts appeals on two grounds. First, he argues the district court should not have assumed for the sake of argument that the traffic stop was extended when he completed the digital paperwork and Baltes called for the drug dog. Rather, he claims the stop was extended when Baltes left him behind in the patrol car to speak with Wignall. Second, he argues there was insufficient evidence available to support reasonable suspicion of illegal-drug possession at this earlier point in the stop, rendering its extension unlawful and any evidence recovered the fruit of the poisonous tree.

A.

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV. "A traffic stop is a Fourth Amendment seizure and requires probable cause of a traffic violation. [A]ny traffic violation, regardless of its perceived severity, provides an officer with probable cause to stop the driver." United States v. Callison, 2 F.4th 1128, 1131 (8th Cir. 2021) (alteration in original) (citations omitted), cert. denied, 142 S. Ct. 830 (2022). Because Betts narrowly passed the semi-truck without using a turn signal, he concedes that Baltes lawfully initiated the traffic stop.

Once a traffic stop is lawfully initiated, "[b]eyond determining whether to issue a traffic ticket," an officer may conduct additional ordinary inquiries that "serve the same objective as enforcement of the traffic code." Rodriguez v. United States, 575 U.S. 348, 355 (2015). This includes "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Id. An officer may conduct other unrelated checks into criminal activity beyond the traffic infraction, but "he may not do so in a way that prolongs the stop, absent . . . reasonable suspicion." Id. In other words, if an officer's unrelated investigations extend the traffic stop beyond the time reasonably required to achieve "'th[e] mission' of issuing a ticket," he must have reasonable suspicion of some other criminal activity. Id. at 350-51 (alteration in original) (citation omitted). If evidence at a traffic stop

is "obtained through a Fourth Amendment violation [it] is normally subject to exclusion." United States v. Forjan, 66 F.4th 739, 748 (8th Cir. 2023). This "extends to 'evidence later discovered and found to be derivative of an illegality or "fruit of the poisonous tree."'" United States v. Tuton, 893 F.3d 562, 568 (8th Cir. 2018) (quoting Segura v. United States, 468 U.S. 796, 804 (1984)).

Betts claims that the district court erred by assuming that the traffic stop was extended when he completed the digital paperwork and Baltes called for the drug dog. He argues the stop was extended earlier when Baltes left him behind in the patrol car to speak with Wignall. We agree.

At the suppression hearing, Baltes testified that he went back to Betts's vehicle to speak with Wignall because he suspected Betts was in possession of methamphetamine. According to Baltes, he would not have done so if nothing had aroused his suspicions. This conversation with Wignall was unrelated to the "mission" of the stop: issuing a warning for failing to signal. See Rodriguez, 575 U.S. at 350-51 (citation omitted). We must therefore decide whether Baltes had reasonable suspicion of criminal activity beyond the traffic infraction when he prolonged the stop by speaking with Wignall. See id. at 355.

B.

"Reasonable suspicion requires 'specific and articulable facts which, taken together with rational inferences from those facts, amount to reasonable suspicion that further investigation is warranted.'" Gonzalez-Carmona, 35 F.4th at 641 (citation omitted). This concept is "not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 232 (1983). Accordingly, our review of reasonable suspicion "looks to the totality of the circumstances, 'allow[ing] officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them.'" United States v. Dortch, 868 F.3d 674, 680 (8th Cir. 2017) (alteration in original) (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)). Still, we view

the totality of the circumstances not from an individual officer's subjective standpoint, but from the standpoint of an objectively reasonable officer. Ornelas v. United States, 517 U.S. 690, 696 (1996).

In denying the motion to suppress, the district court considered information Baltes obtained from his conversation with Wignall, including Wignall's criminal history and the inconsistent travel plans she proffered. Because we agree with Betts that the stop was extended by that very conversation, we agree that the district court erred when it considered those two facts in its reasonable-suspicion analysis. Still, the remaining evidence considered by the district court adequately supported its finding of reasonable suspicion, all of which was available to Baltes before he spoke with Wignall.

Baltes had observed Betts's symptoms of drug use: rotting teeth, quick speaking, profuse sweating, and rapid, shallow breathing. The sweating and rapid, shallow breathing persisted even when Baltes moved Betts to the quieter, air-conditioned patrol car. Significantly, Baltes had also observed the torch-style lighter on the passenger floorboard of Betts's vehicle. He knew these lighters were frequently used to heat methamphetamine and that Betts was on parole for possession and delivery of the same. Baltes was entitled to "reasonably draw on his training and experience" when concluding that this was evidence of use and possession of methamphetamine. Dortch, 868 F.3d at 680.

Betts's travel plans also supported reasonable suspicion. Baltes knew that I-80 was a significant thoroughfare for drug activity. See Gonzalez-Carmona, 35 F.4th at 641 (concluding that officer's experience detecting drug trafficking along I-80 contributed to reasonable suspicion). Likewise, he knew that Las Vegas was a collection point for drugs. See United States v. Noriega, 35 F.4th 643, 650 (8th Cir.) (concluding that officer's knowledge of Las Vegas as a collection point for narcotics contributed to reasonable suspicion), cert. denied, 143 S. Ct. 413 (2022). And Baltes felt it was unusual for Betts to have turned around in the middle of a long, uneconomical drive for a short vacation, rather than find a replacement sitter. See

United States v. Pacheco, 996 F.3d 508, 512 (8th Cir. 2021) (concluding that odd answers about unusual travel plans contributed to reasonable suspicion).

Betts tries to minimize the significance of these facts by highlighting that each is innocent in isolation. With respect to his sweating and mannerisms, Betts argues that it "cannot be deemed unusual for a motorist to exhibit signs of nervousness when confronted by a law enforcement officer." United States v. Beck, 140 F.3d 1129, 1139 (8th Cir. 1998). But while we have recognized that nervousness is generally of limited significance and must be treated with caution when analyzing reasonable suspicion, it is not so limited when combined with "other more revealing facts." United States v. Jones, 269 F.3d 919, 928-29 (8th Cir. 2001).

Finally, Betts argues that his rotting teeth and prior arrests are only evidence of drug use at some indeterminate time in the past, and that nothing Baltes knew placed the torch-style lighter in context. See United States v. Simpson, 609 F.3d 1140, 1152 (10th Cir. 2010) (giving "little weight" to butane lighters because they could be found "in the vehicle of any innocent traveler"). But in analyzing reasonable suspicion, we do not view officers' observations as "discrete and disconnected occurrences." United States v. Poitier, 818 F.2d 679, 683 (8th Cir. 1987). Rather, we view them "as a whole." Id. Likewise, we must view an officer's observations through their own eyes, since they are "trained to cull significance from behavior that would appear innocent to the untrained observer." Id.

Baltes knew that Betts was on parole for possession and distribution of methamphetamine, and he saw Betts showing persistent symptoms of its use. The stop occurred on a known thoroughfare for drug activity, and Betts's destination was known for drug trafficking. Moreover, Betts's purported plans seemed uneconomical, and Baltes was suspicious of the pet-sitting story. These facts provide revealing context to what could otherwise be innocent dental problems or an innocent lighter. Cf. Arvizu, 534 U.S. at 274 (stating that Terry v. Ohio, 392 U.S. 1 (1968) precludes a "divide-and-conquer" approach to potentially innocent facts in a reasonable-suspicion analysis). Viewed "as a whole," sufficient evidence justified

Baltes's suspicion that Betts was in possession of illegal drugs by the time he left Betts seated in the patrol car and walked back to Betts's vehicle to question Wignall. Poitier, 818 F.2d at 683.  Accordingly, reasonable suspicion existed to extend the stop, no evidence obtained was the fruit of the poisonous tree, and the district court did not err in denying the motion to suppress.

III.

For the foregoing reasons, we affirm the district court's denial of the motion to suppress.

KELLY, Circuit Judge, dissenting.

I agree that the traffic stop was extended when Trooper Baltes got out of his patrol car to speak with Betts's passenger, Wignall, on issues that were unrelated to the traffic infraction. The district court, however, assumed that the traffic stop did not end until several minutes later—after Baltes had spoken with Wignall, returned to his patrol car, and had Betts sign a written warning. As a result, in concluding that Baltes had reasonable suspicion to extend the traffic stop, the district court relied on several pieces of information that Baltes only learned *after* he had already extended the stop.

Betts asks us to remand his case to give the district court an opportunity in the first instance to make the necessary factual findings to determine whether Baltes had reasonable suspicion to extend the traffic stop when he got out of the patrol car. I would grant that request. I have serious reservations about whether Baltes had information rising to the level of reasonable suspicion to prolong the stop. See United States v. Batara-Molina, 60 F.4th 1251, 1258–59 (10th Cir. 2023) (concluding it was error to treat common items like butane lighters, or cost-cutting measures when traveling a long distance, as suspicious). However, the district court is best placed to decide and weigh the relevant facts.

Respectfully, I dissent.

_____